**TELEMUNDO de PUERTO RICO, INC.,
Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent, Cross–
Petitioner.**

No. 96–1945.

United States Court of Appeals,
First Circuit.

Heard April 11, 1997.

Decided May 15, 1997.

Jay A. García–Gregory with whom Tristán Reyes–Gilestra and Fiddler, Gonzalez & Rodriguez, San Juan, PR, were on brief, for petitioner.

Ginoris Vizcarra de López–Lay, with whom López–Lay Vizcarra & Porro, Santurce, PR, was on brief, for intervenor.

John D. Burgoyne, Assistant General Counsel, Washington, DC, with whom Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, South Euclid, OH, and Aileen A. Armstrong, Deputy Associate General Counsel, Washington, DC, National Labor Relations Board, were on brief, for respondent.

Before SELYA, Circuit Judge, ALDRICH, Senior Circuit Judge, and LYNCH, Circuit Judge.

SELYA, Circuit Judge.

We live in the age of television, and the judicial system is not immune. This case, however, varies the usual setting in which courts and cameras coalesce, for our interest lies behind the television screen. In pursuing that interest, we entertain today a question familiar to a generation of television viewers: "Who's the Boss?"

The script for this episode features Telemundo of Puerto Rico, Inc. (the Company), which petitions to set aside a final order of the National Labor Relations Board (the Board) determining that it unlawfully refused to recognize and bargain with the Unión de Periodistas, Artes Gráficas Y Ramas Anexas (the Union). The Board cross-petitions for enforcement of its order pursuant to the National Labor Relations Act (the Act), and specifically, 29 U.S.C. § 160(e), (f) (1994). We enforce the order.

## I. SETTING THE LIGHTS

Telemundo operates a television station in Hato Rey, Puerto Rico. In December of 1994, the Union (which appears in this venue as an intervenor) sought to be certified as the exclusive collective bargaining representative of a tiny group of Company employees known as technical directors (TDs). Telemundo opposed the effort, casting the three TDs as supervisors (and, thus, part of management). Agents of the Board conducted a representation proceeding at which evidence was taken. The record was closed in April 1995. On January 30, 1996, the regional director issued a decision finding the TDs to be run-of-the-mill employees, not supervisors, and mandating an election (to take place on February 28, 1996) for a bargaining unit composed solely of the three TDs.

On February 12, the Company sought reconsideration; it filed a request for review and annexed to the papers a letter dated May 15, 1995, in which it had informed the TDs' immediate superior, Rafael Corps, that his position—technical supervisor (TS)—was to be eliminated effective June 16, 1995. On February 28, the three TDs voted unanimously to join the Union. The Board denied the Company's request for review two days later and thereafter certified the Union as the bargaining unit's representative.

It is common ground that employers cannot obtain direct review of unfavorable certification decisions. *See American Fed'n of Labor v. NLRB*, 308 U.S. 401, 409–11, 60 S.Ct. 300, 304–05, 84 L.Ed. 347 (1940). Consequently, if an employer is dissatisfied with the outcome of a representation proceeding, the option of choice is to refuse to bargain and to raise any infirmity in the certification decision as a defense to the unfair labor practice charge that almost inevitably will ensue. *See, e.g., Boire v. Greyhound Corp.*, 376 U.S. 473, 477, 84 S.Ct. 894, 896–97, 11 L.Ed.2d 849 (1964); *S.D. Warren Co. v. NLRB*, 342 F.2d 814, 815 (1st Cir.1965). So here: the Company stonewalled, the Union pressed an unfair labor practice charge, and the Company defended on the ground that the bargaining unit was inappropriate because the TDs were supervisors. As part of this defense, the Company asked the Board to pay special heed to (1) the letter eliminating the technical supervisor's position, and (2) an affidavit executed well after the election by Elizabeth Rivera, a member of management, purporting to describe changes in the TDs' duties.

The General Counsel moved for summary judgment. The Board obliged, rejecting the proffered affidavit, upholding the underlying certification, and ruling that the Company's refusal to bargain violated the Act. *See Telemundo of P.R., Inc.*, 321 NLRB No. 133, slip op., 1996 WL 473376 (NLRB Aug. 16, 1996). These proceedings followed apace.

## II. ASSEMBLING THE CAST

The employees in the bargaining unit are members of the Company's production services department, which has the responsibility for producing live and taped telecasts. During the pendency of the representation proceeding, the department comprised, *inter alia*, the director (Rivera), the technical supervisor (Corps), three program directors, three TDs, audio and lighting persons, and eighteen studio technicians. Typically, the TS prepared a daily schedule delineating which employees would work on which programs and establishing a specific set of responsibilities for three crews, each headed by a TD and including technicians (e.g., cameramen, a floor manager or coordinator, audio and lighting persons, a character generator operator) assigned to the crew by the TS.

In the pre-production stage, the crew's activities are dictated for the most part by the script for the upcoming program. The TD is given the script, sometimes called a run-down, and it is incumbent upon him to ensure that the studio is prepared for production according to the script and that all hands are present and in their places. When the performance begins, a program director takes over and the TD retires to operate the camera control panels in the control room. Some crew members work in the control room alongside the TD; others work on the floor.

After the performance ends, the TD again comes to the fore; in the course of an approximately 30–minute process known as the wrap, the TD and his crew store the equipment and other programming paraphernalia in the control room. All three TDs, but no studio technicians, possess keys to the control room, and, after the equipage is stored, the TD assumes responsibility for locking the room. The TD also prepares and files a daily report which memorializes the crew's membership, catalogues the equipment used during production, and relates any problems that occurred with regard to either personnel or equipment. The program director and the floor coordinator likewise file daily reports.

To achieve a balanced picture, it is important to note what TDs do not do. They ordinarily do not make disciplinary recommendations in their daily reports; rather, the technical supervisor reads the reports and takes whatever disciplinary action he thinks

is appropriate. The TDs neither participate in the disciplining of errant employees nor perform employee evaluations. They do not interview, hire, promote, demote, or terminate other workers. They do not address employee grievances.

As in any workplace, absenteeism occurs. In a TD's absence, another TD or the TS will replace him. Technicians who find themselves unable to work must inform the TS, who will secure a replacement. If neither the department director nor the TS is at the station (as frequently occurs on weekends, holidays, and during some night shifts), a TD may be the highest-ranking employee on the premises. As such, he will recruit needed substitutes from another crew or from a list composed by the technical supervisor and posted in the production office. The TS often will "pop in" on such occasions, and, in any event, the TDs have the home telephone numbers of both the director and the TS, and they are under instructions to call either or both of these individuals in case of an emergency.

The TDs have some trappings of a higher echelon. They receive more munificent salaries, larger bonuses, and better benefits than the studio technicians. They rate reserved parking spaces and separate desks (albeit in a common office). They occasionally have been invited to attend supervisors' meetings (including a few meetings at which collective bargaining negotiations were discussed). Sporadically, TDs have initiated meetings among technical personnel—but they do not have the power to follow through on such initiatives unassisted. For instance, when a TD notified Rivera of his wish to discuss tardiness, work habits, and care of equipment with the technicians in his crew, Rivera called such a meeting and the TD ran it. On another occasion, a TD drafted (but did not send) a memorandum requesting that technical personnel report to the studios at the

entry time set by management even if they had no assigned work then and there. Rivera rewrote the memo for signature by the TS and the TD, adding a reminder about the possible consequences of noncompliance.

## III. THE RATINGS

In rating the Board's performance, we first review its determination that the TDs are not supervisors.

### A. *Receiving Our Cues.*

To put this case into perspective, it bears remembering that the Act strives to limn a clear distinction between management and labor. To that end, supervisory employees are excluded from the bargaining process because they must represent the interests of their employer rather than the interests of their coworkers. *See Stop & Shop Cos. v. NLRB*, 548 F.2d 17, 19 (1st Cir.1977). The Act defines a "supervisor" as "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11). Because the statute is to be read in the disjunctive, any one of the enumerated powers may signify supervisory status. *See Northeast Utils. Serv. Corp. v. NLRB*, 35 F.3d 621, 624 (1st Cir.1994), *cert. denied,* 514 U.S. 1015, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995); *Maine Yankee Atomic Power Co. v. NLRB*, 624 F.2d 347, 360 (1st Cir.1980). Nonetheless, as the definition's final clause reflects, Congress intended to exclude " 'straw bosses,' 'lead men,' and other low-level employees having modest supervisory authority" from supervisor status.[1] *NLRB*

---

1. The derivation of the term "straw boss" bears mentioning:

> In the early days of logging in mountainous country straw was spread upon slopes too steep for horses to hold back a sled load of logs but not so steep as to require "bridling," i.e., looping a short length of chain around a sled runner to drag underneath it, or holding the

> load back by means of a long rope attached to the rear of the sled and wound once or twice (snubbed) around a stump at the top of the slope to provide friction. After each passage, sometimes at full gallop to keep the horses ahead of the load, the straw was naturally displaced so a man with a pitchfork was posted at each slope to keep the straw evenly

*v. Res–Care, Inc.,* 705 F.2d 1461, 1466 (7th Cir.1983) (quoting legislative history). Thus, even an enumerated power must involve the exercise of independent judgment in order to brand the holder of the power as a supervisor.

■ Given the myriad iterations of authority that are possible and the subtle distinctions that easily can be drawn, courts must afford great deference to the Board's expert determination of which workers fall into which classification. *See Goldies, Inc. v. NLRB,* 628 F.2d 706, 710 (1st Cir.1980); *Maine Yankee,* 624 F.2d at 360; *see also Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951) (describing the Board as an agency "presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect"). Consequently, we must accept the Board's findings as to which employees are supervisors and which are not unless those findings fail to derive support from substantial evidence in the record as a whole. *See Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 464–65; *Providence Hosp. v. NLRB,* 93 F.3d 1012, 1016 (1st Cir.1996); *see also* 29 U.S.C. § 160(e), (f).

**B. *Addressing the Studio Audience.***

■ The Company contends that the Board engaged in piecemeal analysis and ignored overwhelming record evidence indicating that TDs responsibly direct studio technicians. After carefully examining the entire record, we conclude that substantial evidence supports the Board's determination that the three TDs are ordinary employees, not supervisors.

The linchpin of this assessment is that, as the Board pointed out, the primary responsibilities of the TDs relate to safeguarding equipment, ensuring that the crew is positioned in accordance with the script, per-

forming actual production work, and documenting the events (or nonevents) incident to the production of particular programs. Although these duties carry responsibilities greater than those borne by studio technicians, they do not require the exercise of independent judgment in any legally meaningful sense.

■ Certainly, superintending the maintenance and use of equipment is not commonly thought to be a supervisory function or to require managerial authority. *See Maine Yankee,* 624 F.2d at 361–62. Similarly, the mere fact that an employee gives other employees instructions from time to time does not in and of itself render him a supervisor for purposes of the Act. *See Stop & Shop,* 548 F.2d at 19. Rather, the portent of that fact depends on the relative significance of the instructions given. *See id.; see also Goldies,* 628 F.2d at 710. In this situation, the TDs do little more than implement the instructions contained in the program's script. Moreover, because each technician has his own assignment and performs repetitive tasks day after day, the crew members require minimal supervision. Viewed in the totality of the circumstances, the TDs' orders are both perfunctory and routine. Thus, the instructions, evaluated in context, do not fairly indicate that the instructors possess authority to exercise independent judgment in overseeing other employees. *See NLRB v. Dickerson–Chapman, Inc.,* 964 F.2d 493, 496, 499–500 (5th Cir.1992); *Goldies,* 628 F.2d at 710; *see also Westinghouse Broad. Co.,* 216 NLRB 327, 329, 1975 WL 5317 (1975) (finding that television directors did not "responsibly direct" employees where the directions they gave were routine technical commands "made pursuant to preconceived production guidelines which ha[d] been approved by higher authorities").

Although the fact that TDs are the highest-ranking persons at the station on certain occasions hints at supervisory status, that fact alone does not convert otherwise routine

distributed. Although teamsters were men of consequence in the lumber camps, the rule was that they were not to start down a slope until the far humbler functionary with a pitchfork, using his "independent judgment,"

passed word that the slope was prepared. Hence the term "straw boss."
*NLRB v. Swift & Co.,* 292 F.2d 561, 563 n. 2 (1st Cir.1961).

duties into supervisory tasks. *See Fall River Sav. Bank v. NLRB,* 649 F.2d 50, 54 (1st Cir.1981). And, here, the additional duties performed by the TDs on those occasions are mundane. None of them necessitates supervisory authority for its due performance. The technical supervisor, not the TD, is responsible for work assignments and replacements; only when the TS is unavailable does the TD locate substitutes, and, even then, the TD must refer to a list of names prepared by the TS. This function—irregular, mechanical, and devoid of independent judgment—does not constitute true authority to assign work.[2] *See Northeast Utils.,* 35 F.3d at 625; *Highland Superstores, Inc. v. NLRB,* 927 F.2d 918, 923 (6th Cir.1991).

Finally, filing daily reports and attending the occasional meeting does not make a decisive difference in this situation. *See, e.g., Stop & Shop,* 548 F.2d at 20; *NLRB v. Magnesium Casting Co.,* 427 F.2d 114, 117 (1st Cir.1970), *aff'd,* 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735 (1971). The reports are merely informational; the TDs do not effectively recommend disciplinary action by completing the forms. Thus, even though the information conveyed in these reports sometimes may lead to the imposition of discipline, it is not the writers who make the call. Even on those few occasions when the TDs have submitted recommendations, their superiors have exercised independent judgment in deciding whether (and if so, what) disciplinary action is warranted. In these respects, then, the TDs are mere scriveners—and acting as an amanuensis or otherwise fulfilling a purely reportorial function is not an indicium of supervisory status. *See Highland Superstores,* 927 F.2d at 922. The evidence as to meetings is also subject to conflicting inferences. To be sure, the TDs attended a few meetings for supervisors—but many such meetings were held to which they were not invited. And when they attempted to arrange technicians' meetings, they were stymied unless they received the blessing of Rivera and Corps.

We do not mean to imply that the evidence is one-sided or that the pivotal question is free from doubt. There are several evidentiary trails in the record, some leading toward one destination at which the Board arrived and some leading away from it. Some of the factors which we have discussed argue in varying degrees for supervisory status—the TDs' hegemony at certain times, their pay level, the giving of instructions to others, occasionally passing out work assignments, filing reports, and attending meetings—but many of them are double-edged. Just as important, the Board considered the collective force of these factors and rejected the inference hawked by the Company in favor of a different, equally supported inference. On reflection, we cannot say that the Board's choice was arbitrary or capricious.

In a last-ditch effort to save the show, the petitioner flips to another channel. It urges that *Maine Yankee* requires overturning the Board's decision here. We do not agree. In *Maine Yankee,* the Board decided that shift operating supervisors at a nuclear power plant were not statutory supervisors. We reversed. 624 F.2d at 366. Because the shift supervisors would have to answer for anything that went wrong with the plant's electrical output, management held them fully accountable and responsible for the employees' performance, and, thus, they possessed authority responsibly to direct other employees. *See id.* at 360–61; *see also NLRB v. J.K. Elecs., Inc.,* 592 F.2d 5, 7 (1st Cir.1979) (holding as supervisors group leaders who could lose their positions if employees in their group failed to meet production quotas). Here, however, the record contains no compelling evidence that a TD is held accountable for the adequate performance of the crew's technical work. This distinction makes a world of difference. *See Northeast Utils.,* 35 F.3d at 625 (distinguishing *Maine Yankee* in excluding from supervisory status coordinators who were not responsible for the actions of other employees).

The Company also claims that *Maine Yankee* bears upon the question of whether TDs

---

2. This conclusion is fortified by the fact that the department director and the TS are on call, and the Company provides the TDs with their home telephone numbers for use if an emergency

arises. *See North Shore Weeklies, Inc.,* 317 NLRB 1128, 1131, 1995 WL 421146 (1995); *Ball Plastics Div.,* 228 NLRB 633, 634, 1977 WL 8436 (1977).

perforce exercise independent judgment because they cannot always reach the department director or the technical supervisor by telephone for emergency consultation. But *Maine Yankee* reflects a vastly different plot. In that case, the panel emphasized the complexity, variety, and dangerousness of operational duties at an atomic power plant, 624 F.2d at 361 & n. 14, 363, and distinguished a shift supervisor there—who had to initiate remedial measures quickly whether or not he could reach his superiors—from "a dispatcher who assigns employees and equipment according to a relatively simple pre-programmed plan" developed by the employer, *id.* at 363. There is no evidence in the instant record of comparable complexity or dangerousness, nor is there evidence that a TD may have to make emergency decisions on hazardous—or even intricate—matters. Indeed, the only relevant proof relates to decisions such as whether to proceed with two cameras instead of three if a cameraman is missing. Under these circumstances, we cannot fault the Board's conclusion that the TDs act more as dispatchers, performing routine tasks and conveying boilerplate instructions, than as supervisors. And, moreover, the Board's conclusion is wholly consistent with the TDs' stated self-perception that they are crew leaders, no more.

To conclude, there is a fine line between the upper strata of employees and the lowest rungs of the management ladder. We freely acknowledge that the Board, had it chosen to weight the TDs' responsibilities differently, could have reached the opposite result. The question is admittedly close, yet its very closeness argues persuasively in favor of deference to the Board. It is particularly in the close cases that judges, who are generalists, should respect the specialized knowledge of the Board and accede to its factbound determinations as long as they are rooted in the record. *See Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 464–65. Put bluntly, courts must be careful not to substitute their judgments for the Board's where, on whole-record review, the evidence supports any of several views and the Board has chosen among them. *See NLRB v. Auciello Iron Works, Inc.,* 980 F.2d 804, 808 (1st Cir.1992); *Stop & Shop,* 548 F.2d at 20.

## IV. THE LATE SHOW

As a fallback position, the Company implores us to remand the case for reconsideration in light of newly submitted evidence which it says signifies expanded responsibilities for the TDs. The Company's request hinges on the import of circumstances that allegedly have arisen since the conclusion of the representation hearing: the elimination of the technical supervisor's position, the ostensible transfer of some of his duties to the TDs, and the inclusion of the TDs as members of a fledgling evaluation committee. This initiative squarely presents the question of when changes in employment responsibilities require reexamination of an earlier determination of employee status.

### A. *Reshooting the Scene.*

█ It is well settled that an employer defending against an unfair labor practice charge cannot relitigate issues which were (or could have been) contested in the underlying representation proceeding. *See* 29 C.F.R. §§ 102.65(e)(1), 102.67(f); *see also Pittsburgh Plate Glass Co. v. NLRB,* 313 U.S. 146, 162, 61 S.Ct. 908, 917, 85 L.Ed. 1251 (1941); *Fall River Sav. Bank,* 649 F.2d at 58. There is an exception to this salutary rule for extraordinary circumstances, usually embodying the emergence of evidence previously undiscovered (or, at least, unavailable). *See* 29 C.F.R. § 102.65(e)(1);[3] *see also Fall River Sav. Bank,* 649 F.2d at 58; *East Mich. Care Corp.,* 246 NLRB 458, 459, 1979 WL 9481 (1979), *enforced without opinion,* 655 F.2d 721 (6th Cir.1981). But this exception should be invoked sparingly, and a court

---

3. The applicable agency rule provides in pertinent part:

A party to a proceeding may, because of extraordinary circumstances, move after the close of the hearing for reopening of the record, or move after the decision or report for reconsideration, for rehearing, or to reopen the record....

Only newly discovered evidence—evidence which has become available only since the close of the hearing—or evidence which the regional director or the Board believes should have been taken at the hearing will be taken at any further hearing. 29 C.F.R. § 102.65(e)(1).

should hesitate to second-guess the Board's assessment that particular circumstances do not qualify for it.

## B. *Switching Stations.*

The proffered evidence is of two types. We treat each type separately.

■ 1. The evidence concerning the elimination of Corps' position as technical supervisor—the May 15 letter—requires scant comment. This letter had been submitted as an attachment to the request for review filed in the wake of the regional director's adverse decision in the representation proceeding. Because a request for review "may not raise any issue or allege any facts not timely presented to the regional director," 29 C.F.R. § 102.67(d), the submission of the letter imposed no obligation on the Board to consider the implications of Corps' termination, especially in the absence of a motion to reopen the record. *See generally East Mich. Care,* 246 NLRB at 459 (dictum).

Beyond that pitfall, a second obstacle looms. The Board, in its own phrase, "fully considered" the May 15 letter. *Telemundo,* slip op. at 1 n. 1. We think it would be curious to remand a case for consideration of evidence that an agency already has fully considered, and we will not do so here.[4]

■ 2. The more nettlesome question relates to the claim that the TDs had been vested with some managerial duties formerly handled by the technical supervisor and had been assigned added responsibility for evaluating other employees. The Board's first notice of these alleged innovations came on July 16, 1996 (*after* the bargaining unit had been certified), when the Company submitted, as part of its reply to the unfair labor practice charge, an affidavit executed on May 9 by Elizabeth Rivera, the department director. The Rivera affidavit claimed, for the first time, that "some administrative duties that were performed by the Technical Super-

visor, such as the preparation of the daily schedules and the revision and approval of the weekly payroll, are now performed by the Technical Directors." The affidavit also disclosed that in March 1996 the Company had created a committee to evaluate the technicians' work and made the TDs members of it (thus enhancing their supervisory roles).

Assuming *arguendo* the truth of the Company's description of these augmented duties, the timing gives us pause. While Rivera's affidavit is strangely silent as to when the changes transpired—its text states only that the TDs assumed the additional duties; it does not broadcast the time frame in which the Company made the reallocation—it is transparently clear that the attempted expansion of the TDs' job description took place at some time after the record had closed in the representation proceeding. Thus, those changes, no matter when thereafter they were effectuated, do not constitute evidence that can vitiate the Board's determination of the propriety of the bargaining unit. It follows that the Board acted well within its lawful authority in refusing to entertain the proffer.

If an employer could insist that evidence of this kind be considered by a reviewing tribunal (be it court or agency) after the administrative record had been closed, then the employer routinely could defease a bargaining unit despite the fact that the Board had determined it to be appropriate. Indeed, doing so would require no greater effort than modifying the affected employees' duties. Such a regime would be antithetical not only to the Board's regulations but also to precedent, policy, and the objectives of the Act.

The regulatory scheme is explicit; the Board determines the appropriateness of a bargaining unit based upon the conditions of employment as they exist at the time of the hearing, and, at least in the absence of extraordinary circumstances,[5] the record there-

---

4. Moreover, we readily appreciate the Board's refusal to attach decretory significance to the epistle. The letter states only that the Company had decided to eliminate the position of technical supervisor. It furnishes no indication that this position elimination might alter or affect the scope of the technical directors' duties.

5. We reject out of hand the Company's argument that the change in duties here constitutes extraordinary circumstances requiring the Board to reexamine the appropriateness of the bargaining unit. If an employer, dissatisfied with the upshot of a representation proceeding, could manufacture circumstances sufficient to require

after may be augmented only by newly discovered evidence. *See* 29 C.F.R. § 102.65(e)(1). This regulation limits the rubric "newly discovered evidence" to "evidence which has become available only since the close of the hearing, or evidence which the regional director or the Board believes should have been taken at the hearing." *Id.* This definition effectively demarcates the representation proceeding as the outermost point in time to which evidence can relate. Facts which *arise* only after the hearing has been concluded and the record closed are irrelevant, whereas facts which are not *discovered* until then (but which relate to the time frame at issue in the hearing) are potentially relevant and may be considered in the Board's discretion.

Precedent fully supports the general proposition that unilateral changes to employment parameters occurring after a representation hearing has been completed can have no bearing upon the outcome of that proceeding. *See K–Mart*, 322 NLRB No. 98, slip op. at 1, 1996 WL 681100 (NLRB Nov. 22, 1996) ("If the change was the result of unilateral actions by the Respondent, it would normally not be a basis for reconsidering the certification . . . ."), *petition for review pending* (D.C.Cir., No. 96–1461); *East Mich. Care*, 246 NLRB at 459 (holding that evidence of subsequent changes made in the duties of unit employees lacked relevance because the evidence "d[id] not involve facts which existed at the time of the hearing in the underlying proceeding and, therefore, d[id] not constitute newly discovered and previously unavailable evidence").

This proposition also comports with sound policy and core purposes of the Act. Affording an employer (or a labor union, for that matter) unilateral control over critical aspects of the collective bargaining process

would dislodge the balance and weaken the structure of the collective bargaining framework. *See Auciello Iron Works, Inc. v. NLRB*, —— U.S. ——, —— – ——, 116 S.Ct. 1754, 1758–60, 135 L.Ed.2d 64 (1996). What is more, enforcing this policy furthers the broad objective of restoring the equality of bargaining power between employers and employees that is so central to the Act, while simultaneously securing stability in labor relations. *See id.* at ——, 116 S.Ct. at 1759; *see also* 29 U.S.C. § 151.

Of course, the closing of the record in a representation proceeding does not freeze the duties of the members of the proposed bargaining unit for all time and in all circumstances. When the motion to reopen is premised on subsequently conferred duties, the Board is warranted in presuming that such duties are irrelevant to its conclusion. An employer who seeks to overcome that presumption bears a heavy burden of showing that a legitimate business necessity arising out of circumstances that were in play before the representation proceeding concluded forced him to recast job descriptions. *See, e.g., Frito Lay, Inc.*, 177 NLRB 820, 821 (1969) (vacating a certification after ensuring that changes in duties were effected pursuant to "legitimate business purposes, and without intent to evade the Respondent's obligation under the certification").[6]

We need not tarry. The Company has presented no evidence that either the shifting of the technical supervisor's duties or the creation of the evaluation committee resulted from events set in motion prior to, and independent of, the representation proceeding. Thus, the evidence contained in Rivera's affidavit falls well outside the compass of relevance and cannot justify a remand for the purpose of relitigating the issue of supervisory status.

reconsideration simply by shifting duties around, then Board certifications would be little more than hollow gestures.

**6.** In *Frito Lay*, the Board dismissed an unfair labor practice complaint, finding that subsequent changes attributable to the company's nationwide reorganization eliminated the "essential factor" which made the previously certified unit appropriate. 820 NLRB at 821. As was repeatedly underscored in the decision, the employer undertook this reorganization as a result of the recommendations provided by a management consultant which had begun a study of the employer's operations *before* the union instituted the representation proceeding. The timing enabled the Board to find that the "restructuring was clearly not for the purpose of avoiding compliance with the Board's unit finding." *Id.* Telemundo has sketched no comparable story line.

There is, moreover, another basis for sustaining the Board's order in the face of the Company's proffer. As we previously mentioned, the evidence is cloudy as to exactly when Telemundo first purposed to augment the TDs' responsibilities. *See supra* p. 277. It is, however, pellucid that the TDs were not assigned to positions on the evaluation committee until March 1996 *at the earliest.* By that time, any proposed change in duties that would convert unit employees to statutory supervisory status (and thereby eliminate the bargaining unit) had become a mandatory subject of collective bargaining. *See East Mich. Care,* 246 NLRB at 459–60 & n. 4; *Highland Terrace Convalescent Ctr.,* 233 NLRB 87, 88, 1977 WL 9261 (1977); *Kendall College,* 228 NLRB 1083, 1087–89, 1977 WL 8495 (1977), *enforced,* 570 F.2d 216 (7th Cir. 1978); *see also* 29 U.S.C. § 158(d) (designating as mandatory bargaining subjects wages, hours, and "other terms and conditions of employment"). Because the change in duties that Telemundo attempted here was done unilaterally and, in the Company's own words, "should carry the day" in its quest to incorporate the TDs into management, the change transgressed the obligation to bargain collectively. Therefore, rather than constituting evidence of misclassification, the new assignment constitutes further evidence of an unlawful refusal to bargain. *See, e.g., NLRB v. Westinghouse Broad. & Cable, Inc.,* 849 F.2d 15, 20, 22 (1st Cir.1988); *East Mich. Care,* 246 NLRB at 459–60 & n. 4.[7]

## V. THE WRAP

We need go no further. The Board's determination that the TDs are employees, not supervisors, is supported by substantial evidence on the record as a whole. Moreover, the Board did not err in holding its ground notwithstanding the unilateral changes that the Company made in the TDs' duties after the record in the representation proceeding had been closed.

---

7. To be sure, there is an exception to this longstanding rule in cases where compelling economic considerations are present. *See Westinghouse,* 849 F.2d at 20. The exception is of no conse-

*The petition for review is denied, the cross-petition is granted, and the Board's order is enforced.*

quence here, however, as the Company does not rely upon it and the record does not disclose any facts that would support its invocation.