USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-2184

 EDWARD STREET DAYCARE CENTER, INC.,

 Petitioner,

 v.

 NATIONAL LABOR RELATIONS BOARD,

 Respondent.

 PETITION FOR REVIEW AND CROSS-APPLICATION
 FOR ENFORCEMENT OF AN ORDER OF
 THE NATIONAL LABOR RELATIONS BOARD

 Before

 Stahl, Circuit Judge,
 Kravitch,* Senior Circuit Judge,
 and Lipez, Circuit Judge.
 
 
 
 
 Barry A. Bachrach, with whom Duane T. Sargisson was on
brief for petitioner.
 John D. Burgoyne, Acting Deputy Associate General
Counsel, with whom Charles Donnelly, Supervisory Attorney, Sonya
Spielberg, Attorney, Frederick L. Feinstein, General Counsel, and
Linda Sher, Associate General Counsel, National Labor Relations
Board, were on brief for respondent.

AUGUST 20, 1999

 
 
 
 *Of the Eleventh Circuit, sitting by designation.
 LIPEZ, Circuit Judge. The Edward Street Daycare Center
(the Center) petitions us to set aside a final order of the
National Labor Relations Board (the Board) requiring the Center to
cease and desist from its refusal to bargain with Truck Drivers
Union Local 170, affiliated with the International Brotherhood of
Teamsters, AFL-CIO (the Union) as the exclusive bargaining
representative of the employees in the bargaining unit. The Board
cross-petitions for enforcement of its order. After reviewing the
record as a whole, we conclude that the Board's decision is
supported by substantial evidence. We therefore deny the Center's
petition, grant the Board's cross-petition, and order enforcement
of the Board's order pursuant to the National Labor Relations Act
(the Act). We begin our explanation with the procedural
background.
I. Procedural History
 In March 1998, the Union filed a petition with the Board
seeking to be certified as the exclusive collective bargaining
representative for all non-supervisory employees of the Center, a
day care center in Worcester, Massachusetts that serves
approximately 93 children "in developmentally appropriate settings
so the families can work or receive training for employment
opportunities." The Center is open five days a week, 52 weeks a
year and employs approximately 23 people (both full and part time). 
The Center challenged the Union's petition, claiming that the
Union's proposed bargaining unit was inappropriate because it
included three Head Teachers and the Coordinator of Billing and
Operations, all allegedly supervisors within the meaning of the
Act.
 On March 20, 1998, a hearing officer employed by the
Regional Director for the First Region of the Board held a hearing
as the Board's designee. Following that hearing, the Regional
Director issued a Decision and Direction of Election on April 15, 
1998, concluding that the Center had not established that the Head
Teachers or the Coordinator of Billing and Operations were
supervisors under the Act. Consequently, the Regional Director
certified an exclusive bargaining unit including "[a]ll full time
and regular part-time head teachers, assistant head teachers in
training, teachers in training, the coordinator of billing and
operations, the cook, the assistant cooks, maintenance and
housekeeping employees, and the bookkeeper." The Center sought
review of the Regional Director's decision before the Board but
such review was denied on May 13, 1998, because the Board
determined that the Center raised "no substantial issues warranting
review." An election was held on May 15, 1998, in which (1) the
professional employees (the head teachers) voted to be included in
a bargaining unit with the non-professional employees, and (2) the
Center's employees voted for the Union by a margin of fifteen to
two. On May 27, 1998, the Board certified the Union as the
bargaining unit's exclusive representative.
 The dispute then took a familiar path. Employers cannot
obtain direct judicial review of union certification decisions. 
Therefore, "if an employer is dissatisfied with the outcome of a
representation proceeding, the option of choice is to refuse to
bargain and to raise any infirmity in the certification decision as
a defense to the unfair labor practice charge that almost
inevitably will ensue." Telemundo de Puerto Rico, Inc. v. NLRB,
113 F.3d 270, 272 (1st Cir. 1997). The Center refused to bargain
with the Union because of its objection to the certification of the
bargaining unit. In response, the Union filed an unfair labor
practice charge. The Board's Acting General Counsel issued an
unfair labor practice complaint alleging that the Center had
violated section 8(a)(1) and (5) of the Act (29 U.S.C.
 158(a)(1)&(5)) by refusing to recognize and bargain with the
Union. The Center responded to the complaint by admitting that it
refused to bargain and defending that refusal by challenging the
validity of the certification on the basis of the Board's
bargaining unit determination in the representation proceeding. 
Specifically, it claimed that the Head Teachers and the Coordinator
of Billing and Operations were supervisors under the Act.
 The Acting General Counsel filed a motion for summary
judgment, contending that the Center was merely attempting to
relitigate matters which previously had been considered and upheld
by the Board in the representation proceeding. On September 14,
1998, the Board issued a notice to Show Cause why the summary
judgment motion should not be granted. In response, the Center
reiterated its position that the earlier representation decision
was erroneous because of the alleged supervisory status of the Head
Teachers and the Coordinator of Billing and Operations. The Center
also asked the Board to consider the affidavit of the Center's
Coordinator for Social Services/Training, who had allegedly been
unavailable to testify at the representation hearing.
 On September 30, 1998, the Board granted the Acting
General Counsel's motion for summary judgment, ruling that all
issues raised by the Center "were or could have been litigated in
the prior representation proceeding," that the Center did not
adequately explain why its so-called "new evidence" was not adduced
at the representation hearing, and that it did not allege any
special circumstances that would require the Board to reexamine the
decision made in the representation proceeding. The Board
concluded that the Center had engaged in an unfair labor practice,
and ordered the Center to recognize and bargain with the Union. 
This appeal ensued.
II. Challenges to the Decision-Making Process
 We begin our legal analysis by considering two challenges
to the way in which the Regional Director and the Board disposed of
this case. First, the Center complains that the Regional Director,
in making her supervisory status determinations, abdicated her
responsibility to make credibility determinations. The Center
notes in particular this statement in the Regional Director's
decision:
 Whenever the evidence is in conflict or
 otherwise inconclusive on particular indicia
 of supervisory authority, the Board will find
 that supervisory status has not been
 established . . . . In regard to the [H]ead
 [T]eachers, much of the evidence is in dispute
 and is, therefore, unreliable for establishing
 supervisory authority. . . .

 Contrary to the parties' urgings, I do not
 make credibility determinations regarding such
 contradictions in the evidence and, instead,
 look to examples of supervisory authority
 being exercised.

The Center argues that this approach means that "an employer could
never demonstrate supervisory status if the Union introduced
contradictory evidence regardless of the quality or credibility of
that evidence." 
 The Center raises a potentially important issue which was
never presented to the Board during the unfair labor practice
proceedings. This omission is fatal to the consideration of this
issue here. See 29 U.S.C. 160(e) ("No objection that has not
been urged before the Board . . . shall be considered by the court,
unless the failure or neglect to urge such objection shall be
excused because of extraordinary circumstances."); Woelke & Romero
Framing, Inc. v. NLRB, 456 U.S. 645, 665 (1982) (holding that "the
Court of Appeals was without jurisdiction to consider th[e]
question" because "[t]he issue was not raised during the
proceedings before the Board, either by the General Counsel or by
[the employer]"); accord Pegasus Broad.of San Juan v. NLRB, 82 F.3d
511, 514 (1st Cir. 1996); Local Union No. 25 v. NLRB, 831 F.2d
1149, 1155 (1st Cir. 1987). The Board noted in its decision
granting the Acting General Counsel's motion for summary judgment
that the Center did not allege any special circumstances that would
require the Board to reexamine the decisions made by the Regional
Director in the representation proceeding. That was a missed
opportunity that we cannot remedy here.
 The Center also assigns error to the Board's decision not
to consider the affidavit of the Center's Coordinator of Social
Services/Training which was proffered to the Board for the first
time in response to the unfair labor practice charge. The Board
refused to consider the affidavit, citing to its regulation
prohibiting the relitigation of issues which could have been
contested in the original representation proceeding absent
exceptional circumstances. See 29 C.F.R. 102.65(e)(1); see also
Pittsburgh Plate Glass Co. v. NLRB, 313 U.S. 146, 162 (1941). The
Center offers nothing exceptional to explain why this affidavit
should be considered new evidence, merely stating that the
Coordinator for Social Services/Training "was out of state and not
available for the initial hearing." We have previously stated that
this exception for new (or newly available) evidence "should be
invoked sparingly, and a court should hesitate to second-guess the
Board's assessment that particular circumstances do not qualify for
it." Telemundo, 113 F.3d at 276-77. We have no occasion to
second-guess the Board's determination in this instance; the Center
did not establish the type of exceptional circumstance which
requires a remand to re-open the record.
III. The Supervisory Status Determinations
 A. The Legal Framework
 The Center challenges the Board's determinations that
particular employees are not "supervisors" within the definition of
the Act. Because supervisors "must represent the interests of
their employer rather than the interests of their coworkers,"
Telemundo, 113 F.3d at 273, supervisors "may not be included in a
bargaining unit designated by the Board." Northeast Util. Serv.
Corp. v. NLRB, 35 F.3d 621, 624 (1st Cir. 1994). The Act defines
a "supervisor" as "any individual having authority, in the interest
of the employer, to hire, transfer, suspend, lay off, recall,
promote, discharge, assign, reward, or discipline other employees,
or responsibly to direct them, or to adjust their grievances, or
effectively to recommend such action, if in connection with the
foregoing the exercise of such authority is not of a merely routine
or clerical nature, but requires the use of independent judgment." 
29 U.S.C. 152(11). "Because the [Act] is to be read in the
disjunctive, any one of the enumerated powers may signify
supervisory status." Telemundo, 113 F.3d at 273. Nevertheless,
because "Congress intended to exclude 'straw bosses,' 'lead men,'
and other low-level employees having modest supervisory authority
from supervisor status. . . . even an enumerated power must involve
the exercise of independent judgment in order to brand the holder
of the power as a supervisor." Id. at 273-74 (internal quotation
marks omitted). Moreover, "[b]ecause of the serious consequences
of an erroneous determination of supervisory status, particular
caution is warranted before concluding that a worker is a
supervisor despite the fact that the purported supervisory
authority has not been exercised." Beverly Enterprises Mass.,
Inc. v. NLRB, 165 F.3d 960, 963 (D.C. Cir. 1999); see also NLRB v.
Bell Aerospace Co., 416 U.S. 267, 280-81 (1974) (noting Congress'
intent to exclude only those supervisors who possess "genuine
management prerogatives").
 The determination of supervisory status vel non, tinged
as it is with policy implications, is within the particular
expertise of the Board. See Universal Camera Corp. v. NLRB, 340
U.S. 474, 488 (1951) (characterizing the Board as "one of those
agencies presumably equipped or informed by experience to deal with
a specialized field of knowledge, whose findings within that field
carry the authority of expertness which courts do not possess and
therefore must respect"). "Given the myriad iterations of
authority that are possible and the subtle distinctions that easily
can be drawn, courts must afford great deference to the Board's
expert determination of which workers fall into which
classification." Telemundo, 113 F.3d at 274. We may not disturb
the Board's findings as to which employees are supervisors and
which are not "unless those findings fail to derive support from
substantial evidence in the record as a whole." Id. (citing
Universal Camera, 340 U.S. at 488); see also Northeast Util., 35
F.3d at 625 (recognizing that the Board is entitled "to wide
latitude in determining which employees fall within the definition
of 'supervisor'"). "Under Board precedent, the burden of proving
supervisor status falls on the party making the assertion of
supervisor status." NLRB v. Hilliard Dev. Corp., __ F.3d __, 1999
WL 508814, at *7 (1st Cir. 1999); see also Beverly Enterprises 
Mass., Inc., 165 F.3d at 962; St. Alphonsus Hosp., 261 N.L.R.B.
620, 624 (1982), enforced, 703 F.2d 577 (9th Cir. 1983).
 With these legal principles framing the analysis, we
examine the evidence underlying the Board's supervisory status
determinations, drawing all "supportable inferences in a manner
consistent with the Board's findings." Hilliard Dev. Corp., 1999
WL 508814, at *2. Of necessity, this examination requires an
extensive marshaling of the facts. "[T]he details of the [putative
supervisor's] functions are critical in ascertaining whether he is
a supervisor as that term is defined" in the Act. See Maine Yankee
Atomic Power Co. v. NLRB, 624 F.2d 347, 359 (1st Cir. 1980).
 B. The Record
 1. Overview
 The Center is run by its Executive Director, Doryl
Rourke, who reports to the Center's Board of Directors, which sets
job descriptions and personnel policies. Any new policies or
changes in policy are communicated by the Board to Rourke, who is
responsible for disseminating the information to her staff. An
organizational chart introduced into the record by the Center shows
the Coordinator of Billing and Operations, the Coordinator of
Social Services/Training, and the Bookkeeper reporting directly to
the Executive Director. The maintenance workers and the cooking
staff report to the Executive Director through the Coordinator of
Billing and Operations. According to the chart, the Head Teachers
report to the Executive Director through the Coordinator of Social
Services/Training. The rest of the teaching staff reports through
the Head Teachers.
 2. The Coordinator of Billing and Operations
 The Board found that the "evidence is scant regarding any
indicia of supervisory authority" for the Coordinator of Billing
and Operations (the Coordinator) (emphasis in original). The
Center contends that the Coordinator is a supervisor because she
has the authority (1) to adjust grievances and to discipline other
employees and (2) to assign work and to responsibly direct other
employees. We examine those claims in turn. 
 a. Adjustment of Grievances and Discipline
 The Center points to its Employee Handbook as evidence
that the coordinator has the authority to adjust grievances. The
Handbook does state that an employee's "supervisor" is the first
step in the grievance process, but there is no indication that the
Coordinator is a "supervisor" under the terms of the Handbook. 
Moreover, Rourke admitted that the Coordinator has never adjusted
a grievance. See Beverly Enterprises Mass., Inc. v. NLRB, 165
F.3d 960, 963 (D.C. Cir. 1999) ("[A]bsent exercise, there must be
other affirmative indications of authority."); see also Chevron,
U.S.A., Inc., 309 N.L.R.B. 59, 69 (1992) (stating that no weight is
given to "job descriptions that attribute supervisory authority
where there is no independent evidence of its possession or
exercise."). The evidence with respect to discipline is equally
equivocal; while Rourke testified that the Coordinator has the
authority to discipline the maintenance employees and the cook, she
admitted that the Coordinator has never exercised this authority in
the six years the position has been in existence, and there are no
other affirmative indications of the Coordinator's actual authority
to discipline. 
 b. Assignment and Direction
 Rourke testified that the cook works "fairly
independently." The only indicia of the Coordinator's supervision
of the cook is her responsibility, "[i]n conjunction with the
Executive Director," to "monitor [the] menus in accordance with
U.S.D.A. standards." Although Rourke testified that the
coordinator reviews the menus and "discuss[es]" them with the cook, 
she went on to testify that "[i]f there's any question, they would
come to [the Executive Director.]"
 With respect to the maintenance staff of two, the
Coordinator does nominally "assign" work to them. Although the
Coordinator has some role in prioritizing the requests for
maintenance, Rourke testified that the prioritizing is a
cooperative process due to the experience of the regular
maintenance worker, prompting the Board to conclude that the
maintenance worker "often participates in the discussion of how to
prioritize work, what to order to do the job, and how to do the
work." The other maintenance employee, who is primarily
responsible for housekeeping, works "off hours" and on weekends. 
The Coordinator rarely sees him; their contact is mainly over the
telephone. See Telemundo, 113 F.3d at 274 (rejecting inference of
supervisory authority where the subordinates "require[d] minimal
supervision"). If the Coordinator receives a complaint that
requested work has not been completed, the Coordinator calls the
employee to inquire into the reason(s) why. However, Rourke
testified that the Coordinator does not write up the omissions as
infractions and generally does not assign unfinished work to the
other maintenance worker, though if she did, "she would tell me
[the Executive Director] that she did that, but she has the
authority to do it."
 To be considered indicative of supervisory status, the
authority to assign and direct has been held necessarily to include
the responsibility "to be answerable for the discharge of a duty or
obligation." Maine Yankee Atomic Power Co. v. NLRB, 624 F.2d 347,
361 (1st Cir. 1980) (quoting Ohio Power Co. v. NLRB, 176 F.2d 385,
387 (6th Cir. 1949)). The evidence presented to the Board fails to
demonstrate that the Coordinator is held accountable for the
performance of the maintenance workers or the cook, or for their
failure to perform. Therefore, the Center's evidence falls short
of establishing the Coordinator's supervisory responsibility in
this regard. See Telemundo, 113 F.3d at 275 ("[T]he record
contains no compelling evidence that [the purported supervisor] is
held accountable for the adequate performance of [the putative
subordinates'] work. This distinction makes a world of
difference."). 
 Finally, Rourke testified that the Coordinator had the
authority to grant maintenance employees time off. No examples
were provided, however, and Rourke also testified that "[t]ime off
is dictated by a policy within the whole agency" and that the
Coordinator of Social Services/Training "does the scheduling for
the staff." Moreover, the Board found that the Executive
Director's testimony was directly contradicted by the Employee
Handbook, which states that vacations may be taken "as arranged by
the Director."
 As we stated in Telemundo, "the mere fact that an
employee gives other employees instructions from time to time does
not in and of itself render him [or her] a supervisor under the
Act." Telemundo, 113 F.3d at 274. The evidence must show that
such employees "possess authority to exercise independent judgment
in overseeing other employees." Id. A review of the entire record
reveals substantial evidence to support the Board's finding that
the Coordinator does not exercise independent judgment as a
supervisor, as required by the Act.
 3. The Head Teachers
 The members of the Center's staff that are assigned to
the six classrooms are divided into three "teams." Each Head
Teacher leads one team, consisting of her or his classroom's staff
plus one other classroom. An Assistant Head Teacher (or an
Assistant Head Teacher in Training) runs the other classroom. In
addition, the teaching complement in each classroom also includes
one and sometimes two other teachers. These secondary teachers are
either Assistant Head Teachers in Training, Assistant Teachers, or
Assistant Teachers in Training. The Center contends that the Head
Teachers satisfy the Act's "supervisor" definition by (1) assigning
work and directing subordinates; (2) having authority to adjust
grievances and discipline other employees; and (3) providing
written evaluations of other teachers. We take each claim in
turn.
 a. Assignment and Direction
 i. In the Classroom
 The Head Teachers obviously exercise some supervisory
control over their classrooms. However, the Board "has generally
and correctly said that employees who routinely direct other
employees based solely on a higher skill level are not
supervisors." Hilliard, 1999 WL 508814, at *13. The issue is
whether they exercise "independent judgment" on behalf of the
employer in the discharge of these responsibilities. 29 U.S.C.
 152(11).
 Rourke asserted that relatively little direction is
ordered by central administration (i.e., the Executive Director and
the Coordinator of Social Services/Training) and that "generally,
the buck stops with the [H]ead [T]eacher" on matters of classroom
administration. Rourke also testified that Head Teachers are
responsible for implementing the policies which are announced at
the planning meetings (attended by the Executive Director, the
Coordinator of Social Services/Training, and the Head Teachers). 
This implementation, she asserts, requires the Head Teachers to
assign tasks to their subordinates and to direct them on execution
of these tasks. Johnson, the Head Teacher, and Nordstrom, the
Assistant Head Teacher in Training, described a more collaborative
approach. The Board characterized Johnson's and Nordstrom's
testimony as establishing "that the Head Teachers do not order or
direct anyone to perform certain tasks, they solicit ideas on how
to implement the curriculum directives in their classrooms." This
finding is amply supported in the record.
 Also, the Board found that the Coordinator of Social
Services/Training "observes the classrooms and instructs the
teachers, including the [H]ead [T]eachers, regarding changes she
wants made. [The Coordinator of Social Services/Training] has the
authority to call teachers into her office and tell them to make
changes, and she has done this with all levels of teachers,
including those below the level of [H]ead [T]eacher, and without
the [H]ead [T]eachers' involvement." The Executive Director
admitted that she, too, has exercised her authority to disregard
the Head Teachers and to instruct subordinate teachers directly. 
Such direct oversight by management without the participation or
knowledge of the employee's "supervisory" Head Teacher is
inconsistent with the Head Teachers' purported authority to
"responsibly direct subordinate teachers." See Maine Yankee Atomic
Power Co. v. NLRB, 624 F.2d 347, 361 (1st Cir. 1980) ("To be
responsible is to be answerable for the discharge of a duty or
obligation." (quoting Ohio Power Co. v. NLRB, 176 F.2d 385, 387
(6th Cir. 1949))).
 Both sides point to a letter from the Coordinator of
Social Services/Training to Head Teacher Johnson dated March 3,
1998. The letter instructed Johnson that she must "keep [her]
porch closed during the morning but [that she] may choose to open
it in the afternoons;" asked her to "please remember good
developmental practice suggests you keep yourself at children's
level;" and directed her to "[c]ontinue to have one group eat in
the room whenever possible. If you find you need your lunch time
changed, please let me know and we will make some accommodations. 
You may also want to think about a better time for other team
members to take morning break if coverage is an issue." While the
letter could be construed to support some supervisory
responsibility for the Head Teachers, the oversight and direction
of such minutiae by the Coordinator of Social Services/Training
supports the Board's finding that Head Teachers are not authorized
to exercise independent judgment in carrying out their supervision.
 ii. Authority to Set Schedules
 While the Head Teacher job description and some of
Rourke's testimony support the position that the Head Teachers
exercise supervisory authority over the schedules of their
subordinates, other evidence supports the Board's contrary
conclusion. Johnson and Nordstrom testified that the team sets the
schedule cooperatively and that any modifications are made
exclusively on a voluntary basis. Johnson testified that, to the
extent a staff coverage issue had to be resolved through an
involuntary assignment, she would have to consult Rourke for
direction. See Telemundo, 113 F.3d at 276 (noting that "the
Board's determination is wholly consistent with the [putative
supervisor's] stated self-perception that they are crew leaders, no
more"). As for substitutes and arrangements for covering absent
teachers, Johnson testified that she possessed no authority to
contact substitutes. As evidence, she said that she had no
knowledge of who was covering her classroom at the time that she
was testifying. She had called and informed the Center that she
was taking the day off for personal reasons. She had no further
responsibility or authority to address the situation.
 iii. Authority to Grant Time Off
 Although Rourke testified that Head Teachers could (and
did) authorize subordinates to take time off, she also testified
that all requests for time off are handled by the Coordinator of
Social Services/Training. Johnson testified that she had no
authority to authorize any time off. At one point in the hearing
a distinction was drawn between regular time off and vacation time
(apparently based on the duration of the requested leave time), but
there was no dispute that vacation was authorized through a bid
process administered by the Coordinator of Social
Services/Training; no one contends that Head Teachers exercise
supervisory authority over vacation time. Finally, conflicting
evidence was offered on the authority to grant compensatory time
for overtime. The Employee Handbook states that "[e]mployees
working beyond their regular hours . . . may adjust their hours on
another day with approval of their supervisor." Again, the
Handbook makes no attempt to define who is a "supervisor." Rourke
asserted that Head Teachers in fact possessed this authority, but
provided no examples. Johnson testified in direct contradiction,
stating that Head Teachers "can't make any decisions about
comp[ensatory] time."
 iv. Authority to Operate the Center
 The Center argues that Head Teachers must have authority
to responsibly direct other employees because Head Teachers are
occasionally left in charge of the Center. Rourke and Johnson both
testified that in the absence of the Executive Director and the
Coordinator of Social Services/Training, a Head Teacher is
nominally left "in charge" of the Center. According to Johnson,
however, when a Head Teacher is left in charge he/she is "not
allowed to make any decisions." Instead, Johnson testified that if
a problem arises while a Head Teacher is nominally "in charge," the
Head Teachers have been given specific instructions to contact the
Executive Director or the Coordinator for Social Services/Training,
"and if they're not available, then someone on the Board of
Directors is to be contacted."
 We have previously held that the "spasmodic and
infrequent assumption of a position of command and responsibility
does not transform an otherwise rank and file worker into a
supervisor." Fall River Sav. Bank v. NLRB, 649 F.2d 50, 54 (1st
Cir. 1981) (quoting NLRB v. Quincy Steel Casting, 200 F.2d 293, 296
(1st Cir. 1952)); accord Telemundo, 113 F.3d at 275. The Board was
justified in refusing to find supervisory status on the basis of
this occasional, nominal authority.
 b. Adjustment of Grievances and Discipline
 It is unclear from the record whether Head Teachers have
the authority to redress grievances. The Employee Handbook simply
states that an employee should initiate the grievance process by
first "(d)iscuss[ing] the matter with his/her immediate
supervisor." The Employee Handbook, however, contains no material
defining "immediate supervisor." Indeed, Assistant Head teacher
Nordstrom testified that while she was on Johnson's "team," Rourke
was her supervisor. Given the testimony that the Coordinator of
Social Services/Training instructed subordinate teachers directly
without the involvement of Head Teachers, she could reasonably be
considered an "immediate supervisor" under the plan as well.
 While neither Rourke nor Johnson could recall any
specific grievances, they had conflicting views as to how
grievances were to be handled. Rourke reiterated the Handbook's
policy that "the first line" in the Center's grievance procedure is
for an employee to address his/her grievance to the "supervisor." 
At another point, Rourke testified that employees should address
their grievances "to whomever, whether it be a teacher or whether,
with whom they have an issue . . . ." Johnson, like Rourke, could
not remember a particular grievance but stated that subordinate
teachers' grievances go directly to Rourke.
 The evidence on the issue of discipline follows a similar
uncertain course. Without setting up a detailed procedure, the
Employee Handbook offers the statement that "Supervisors are the
key people in ensuring that [the Center's] standards and rules are
observed and are responsible for appropriate action for any
violation of the standards and rules as set forth by the [Center]." 
Again, the record is devoid of any instances where such authority
has actually been exercised by a Head Teacher. The Executive
Director did not speak to the Head Teachers' role in discipline per
se, but did make references to the Head Teachers' responsibility
"to make sure that her subordinate is doing what is directed." 
Later, the Executive Director stated that the "role [of the Head
Teacher] is to make sure that the classroom runs smoothly, that the
people are reporting to work on time . . . that they're doing what
their, what their assigned duties are, and that if they're not, it
is also [the Head Teachers'] responsibility to make sure that in
some way this happens, either by reprimand, either by bringing it
to my attention and dealing with it herself or sitting down with
the person." At another point in her testimony, Rourke stated that
in supervising subordinate teachers, Head Teachers have the ability
to "observe their teaching ability, to make suggestions and
comments, . . . [and] to come to [the Executive Director] if they
feel there is a larger issue." This evidence is equivocal on
whether Head Teachers have disciplinary authority. Johnson,
however, was unequivocal in her insistence that as a Head Teacher
she has no disciplinary authority. Johnson insisted that Rourke
administered discipline at the Center. Understandably, on this
record, the Board was uncertain about the disciplinary role of the
teachers.
 3. Evaluations
 It is undisputed that Head Teachers prepare written
evaluations of subordinate teachers on their "teams." However, the
frequency and the significance of these evaluations were disputed. 
While the Center's written policies called for annual evaluations,
Johnson testified that she had not evaluated any of her subordinate
teachers in the preceding two to three years. Rourke confirmed
that "it might go two or three years before [employees are]
evaluated." Rourke also testified that "evaluations have nothing
to do with whether somebody gets a raise or doesn't get a raise"
and that "[a]cross-the-board raises are voted by the Board on an
annual basis." Nevertheless, the Center argues that evaluations
"are placed in the employee's personnel files," and that this fact
alone "demonstrates the importance of the evaluations and supports
the supervisory status since the evaluations are reasonably
calculated to affect the employee's status." The Center relies on
NLRB v. Beacon Light Christian Nursing Home, 825 F.2d 1076 (6th
Cir. 1987), to support this proposition.
 Beacon Light is unavailing. There, the allegedly
supervisory nurses were "expected and encouraged to [utilize
evaluation and discipline forms] routinely," and "[t]hree or four
such citations could result in formal disciplinary action including
discharge, suspension or demotion." Beacon Light, 825 F.2d at
1079. The authority of the disputed supervisors to "effectively
recommend" employment decisions based on their own independent
judgment, a hallmark of supervision under 29 U.S.C. 152(11), was
clear evidence of supervisory authority. See id. Here, the
evidence allowed the Board reasonably to find that such evaluations
"have no impact on wages, promotions, or other terms and conditions
of employment." See Hilliard, 1999 WL 508814, at *9-10.
IV. Conclusion
 We are mindful of the difficult judgments these fact-
intensive cases require. The evidence supporting the Board's
decision is close, particularly on the status of the Head Teachers. 
This closeness makes deference to the Board especially appropriate. 
"It is particularly in the close cases that judges, who are
generalists, should respect the specialized knowledge of the Board
and accede to its factbound determinations as long as they are
rooted in the record." Telemundo, 113 F.3d at 276. In the final
analysis, the Board's determinations that the Coordinator of
Billing and Operations and the Head Teachers are employees and not
supervisors are supported by substantial evidence on the record as
a whole.
 Accordingly, we deny the petition for review, grant the
cross-petition, and enforce the Board's order.