USCA1 Opinion

 

 
 United States Court of Appeals
 For the First Circuit
 ____________________

No. 98-1610

 NATIONAL LABOR RELATIONS BOARD,
 Petitioner,
 
 and
 
 SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 285,
 Intervenor,
 
 v.
 
HILLIARD DEVELOPMENT CORPORATION, d/b/a PROVIDENT NURSING HOME,
 Respondent.
 ____________________
 
 ON APPLICATION FOR ENFORCEMENT OF AN ORDER 
 OF THE NATIONAL LABOR RELATIONS BOARD
 ____________________
 
 Before
 
 Torruella, Chief Judge,
 Selya and Lynch, Circuit Judges.
 
 ____________________
 
 
 Preston L. Pugh, Attorney, with whom David Habenstreit,
Supervisory Attorney, Frederick L. Feinstein, General Counsel,
Linda Sher, Associate General Counsel, and John D. Burgoyne, Acting
Deputy Associate General Counsel, National Labor Relations Board,
were on brief, for petitioner.
 David B. Rome, with whom Pyle, Rome, & Lichten and Craig
Becker were on brief, for intervenor.
 Keith H. McCown, with whom Allison K. Romantz, Stacy L.
Miller, and Morgan, Brown & Joy were on brief, for respondent.

 ___________________
 
 July 22, 1999
 ____________________
 
 
 LYNCH, Circuit Judge. The National Labor Relations Board
petitions to enforce its order against Hillard Development
Corporation, doing business as Provident Nursing Home. The Board
found that Provident violated 8(a)(5) and (1) of the National
Labor Relations Act, 29 U.S.C. 158(a)(5), (1), by refusing to
bargain with the Union as a representative of a bargaining unit
that includes thirteen district and charge nurses. Provident
argues that its refusal to bargain was not an unfair labor practice
because the district and charge nurses are supervisors, as that
term is defined in 2(11) of the Act, 29 U.S.C. 152(11), and the
nurses as such are precluded from participating in collective
bargaining. See 29 U.S.C. 152(3),(11).
 Whether mid-level care providers such as Provident's
district and charge nurses are supervisors under 2(11) is a
significant legal issue that has divided the circuits. It is also
an issue of some societal significance, affecting increasing
numbers of people who will need nursing home care as the post World
War II baby boomer generation ages. The issue is significant in
part because labor costs in the healthcare industry comprise a
large portion of overall costs (estimated to be roughly 60% of
 hospital costs). The issue is important both to management,
concerned with economic viability, and to employees, concerned
about job security and workplace rights.
 Historically, the NLRB itself has proven unsympathetic to
employers' arguments that such nurses may not be unionized. 
Indeed, the NLRB earlier adopted a unique, more hostile test than
that used for other professions to determine whether nurses were
supervisors. Under the Board's "patient care" test, nurses were
not considered to be exercising authority "in the interest of the
employer," as required under the definition of supervisor in
 2(11), if they directed less-skilled employees only "in the
exercise of professional judgment incidental to the treatment of
patients." NLRB v. Health Care & Retirement Corp. of America, 511
U.S. 571, 574 (1994) ("Health Care & Retirement Corp.") (internal
quotation marks omitted). The Supreme Court set aside that test in
1994 as contrary to the Act. See id. at 574-84. 
 This history leads Provident to suggest that less
deference should be given to the Board's interpretation of 2(11)
than would normally be required under Chevron USA Inc. v. Natural
Resources Defense Council, Inc., 467 U.S. 837 (1984). Provident
also argues that the Board's conclusions are not, in any event,
supported by substantial evidence. While some of the issues are
close, we enforce the Board's order. We find no reason not to
apply our usual standard of deference to the Board's
interpretations of ambiguous portions of the Act, and we determine,
upon reviewing the record, that the Board's findings of fact are
adequately supported. 
 I. Background
 We recount the facts, drawing supportable inferences in
a manner consistent with the Board's findings. Provident operates
a for-profit 112-bed residential nursing home in Brighton, 
Massachusetts. It provides intermediate care for geriatric
residents with major mental illnesses. The home has two floors. 
The first floor houses fifty-two residents and is divided into two
districts, or units, both of which are served by one nursing
station. The second floor has sixty patients, and is divided into
two districts, each of which has its own nursing station. The
nurses provide both nursing care and general assistance with
residents' daily activities. The Director of Nursing has overall
charge of the Nursing Department. Under her are three registered
nurses who serve as Unit Managers. The Unit Managers and the
Director of Nursing are concededly supervisors.
 Under the Unit Managers are approximately thirteen nurses
who are employed as district nurses and charge nurses. These
nurses, who are either registered nurses or licensed practical
nurses, directly provide patient care. The district nurses work
the day shift and have some responsibility for reviewing the work
and documentation from the other two shifts. Charge nurses perform
the same duties as district nurses, but without any monitoring
responsibilities outside of their own shift. Charge nurses work on
the evening and night shifts. Under these district and charge
nurses are approximately thirty Mental Health Assistants ("MHAs").
MHAs are responsible for assisting residents with their daily
activities, including bathing, dressing, eating, and walking. Each
district and charge nurse oversees the work of two to three MHAs. 
Between six at night and six in the morning, the charge nurses are
the highest level of authority at the facility.
 Unit Managers organize residents into groups and
determine the duties to be performed by MHAs during each shift for
each group. A district or charge nurse then assigns each MHA to
one of these predefined groupings, based on the residents' needs
and particular MHA skills. Nurses also determine the order in
which MHAs take lunches and breaks, within boundaries established
by Provident. Because the resident group assignments are not often
changed, the MHAs are generally familiar with their assigned duties
and do not need to be directed closely. If an MHA is absent and is
not replaced for the day, a nurse redistributes the absent MHA's
duties to the remaining MHAs on shift. If an MHA has a complaint
about an assignment or other work issue, the MHA can bring the
complaint to a nurse. If the MHA and nurse cannot resolve the
problem, the two will bring it to a Unit Manager. In emergency
situations requiring extra MHA assistance, nurses may ask MHAs to
work after their shifts have ended or temporarily transfer MHAs
between floors. In either event, the nurse will inform the Unit
Manager of the nature of the emergency and the solution
implemented. 
 District or charge nurses who observe MHAs abusing
residents or acting insubordinately document their observations on
an "Employee Counseling Form" or an "Anecdotal Record." MHAs are
also required to document any instances of MHA misconduct on an
Anecdotal Record. These forms do not ask for a recommended
disciplinary measure. Unit Managers decide whether the reports
will be labeled verbal or written warnings within Provident's
progressive disciplinary system.
 A district or charge nurse who finds that an MHA is
inappropriately dressed, intoxicated, fighting with other staff
members, or sleeping on the job has the authority to send the MHA
home. In this situation, the nurse will call a Unit Manager to
suggest that the MHA be sent home or to notify the Unit Manager
that he or she plans to do so. 
 Provident's MHAs receive annual written evaluations of
their work. Unit Managers assign the nurse who works most
frequently with each MHA to prepare the MHA's evaluation. The
nurse comments on different areas of the MHA's performance and
gives the MHA a score between one and five in each area. Both the
Unit Manager and the Director of Nursing then review the evaluation
form. They may question the nurse if they feel that a particular
rating is too high or low and may ask the nurse to change it or at
least review its accuracy before showing the evaluation to the MHA. 
An MHA who disagrees with a rating can also ask the nurse to change
it. 
 In 1991, Provident began using the evaluation scores as
a basis for an annual merit pay increase for some of the MHAs. 
Certain MHAs do not receive merit pay tied to their evaluation
scores: MHAs who are paid per diem, MHAs already earning maximum
wages under Provident's salary structure, and MHAs who receive
merit pay based on administrative decisions apart from the
evaluation system. In early 1993, for example, the administrator
raised the pay range for a substantial number of MHAs and changed
the evaluation anniversary date for those MHAs. Accordingly, those
MHAs were evaluated in 1993 but did not receive merit increases
based on those evaluations.
 For those employees who are eligible for merit increases,
Provident uses a scale that matches a range of evaluation scores
with a certain level of pay increase. Provident's administrator
and Director of Nursing change the scale periodically and may
eliminate merit increases altogether, depending on the nursing
home's financial circumstances. Although the charge and district
nurses are aware that the evaluation scores they give may affect an
MHA's pay, they are generally unaware at the time they write the
evaluation of the precise correlation between any given score and
the pay increase to which it corresponds. Once the evaluation is
complete, the nurse gives the form to the Director of Nursing, who
compiles an average score, determines the increase associated with
that score, writes on the form the increase that she recommends,
and then sends it to the administrator for review. The
administrator may approve or disapprove the increase or give the
MHA a higher increase than would otherwise correlate to the MHA's
evaluation score. 
 II. Procedural History
 On October 12, 1993, Local 285 of the Service Employees
International Union filed a petition with the Board seeking
certification as the representative of a unit composed of Provident
employees, including both the MHAs and the district and charge
nurses. Provident contended that the Board should exclude the
district and charge nurses from the bargaining unit because the
nurses are supervisors under 2(11) and thus ineligible for union
representation under the Act. After conducting a hearing, the
Board's Regional Director issued a decision on November 24, 1993,
in which she directed an election and rejected Provident's
contention that the nurses are supervisors. 
 Provident then sought Board review. While the request
for review was pending, the Board's regional office conducted an
election and impounded the ballots cast. The Board later agreed to
review the Regional Director's decision "solely with respect to the
Regional Director's finding that evaluations prepared by the
Employer's district nurses and charge nurses . . . are not
indicative of supervisory status," denying Provident's request for
review "[i]n all other respects." Provident filed a request for
reconsideration of the portion of its request denied by the Board. 
 In June 1996, the Board granted Provident's request for
reconsideration and remanded the case to the Regional Director for
further consideration in light of the Supreme Court's decision in
Health Care & Retirement Corp. and the Board's decisions in Ten
Broeck Commons, 320 N.L.R.B. 806 (1996), and Providence Hospital,
320 N.L.R.B. 717 (1996). 
 The Regional Director's supplemental decision concluded
once again that the nurses were not supervisors under the Act. On
review, the Board affirmed the Regional Director's conclusion that
"the nurses' role in evaluating employees is insufficient to confer
supervisory status." Hilliard Dev. Corp., Case 1-RC-20057, at 2
(NLRB Feb. 6, 1997). Accordingly, the regional office counted the
ballots and ascertained that the Union had won the election. The
Regional Director rejected Provident's objections and the Board
denied further review. 
 In order to obtain judicial review of the bargaining
unit, Provident refused to bargain with the Union, prompting the
Union to file a charge with the Board under 8(a)(5) and (1) of
the Act. Provident's answer to the complaint admitted its refusal
to bargain but disputed the propriety of the Board's certification.
The Board's Decision and Order reaffirmed its earlier finding that
Provident's district and charge nurses are not supervisors under
 2(11) of the Act. See Hilliard Dev. Corp., 324 N.L.R.B. No. 46
(Aug. 20, 1997). This application for enforcement of the Order
followed.
 III. Standard of Review
 This court must accept the Board's factual findings as to
which employees are supervisors unless those findings are not
supported by substantial evidence in the record as a whole. See 29
U.S.C. 160(e); Telemundo de Puerto Rico, Inc. v. NLRB, 113 F.3d
270, 274 (1st Cir. 1997) (citing Universal Camera Corp. v. NLRB,
340 U.S. 474, 488 (1951)). Under the substantial evidence
standard, "[t]he Board . . . may not distort the fair import of the
record by ignoring whole segments of the uncontroverted evidence." 
Maine Yankee Atomic Power Co. v. NLRB, 624 F.2d 347, 360 (1st Cir.
1980). However, "the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence." 
American Textile Mfrs. Inst. v. Donovan, 452 U.S. 490, 523 (1981)
(internal quotation marks omitted). The ultimate question for the
court in reviewing the Board's factual findings is "whether on this
record it would have been possible for a reasonable jury to reach
the Board's conclusion." Allentown Mack Sales & Serv., Inc. v.
NLRB, 522 U.S. 359, 118 S. Ct. 818, 823 (1998).
 Statutory interpretation questions are reviewed de novo. 
See 5 U.S.C. 706. Where the intent of Congress is clear, that
intent must be given effect. See Chevron, 467 U.S. at 842-43; NLRB
v. Beverly Enterprises--Massachusetts, Inc., 174 F.3d 13, 22-23
(1st Cir. 1999). If, on the other hand, the statute is ambiguous
or silent with respect to a specific issue, we will defer to the
Board's interpretation so long as that interpretation is a
"permissible" one, Chevron, 467 U.S. at 843, that is, one which is
"rational and consistent with the statute," Beverly Enterprises--
Massachusetts, 174 F.3d at 22 (internal quotation marks omitted).
 Provident suggests that the Board is not entitled to
deferential review of its interpretation of ambiguous portions of
 2(11) because, it says, the Board is biased and has a
metaphorical thumb on the scale, tilting the balance toward a
finding of non-supervisory status. It points out that a number of
the circuits have rejected Board orders finding mid-level nurses in
nursing homes not to be supervisors and that several have
attributed to the Board a policy bias in this area. As evidence
of bias, Provident notes that the Board has found nurses to be
supervisors only once since the decision in Health Care &
Retirement Corp. See First Healthcare Corp., 323 N.L.R.B. 1171
(1997). 
 We reject Provident's suggestion. After Health Care &
Retirement Corp., the Board held that it would no longer use a
special test to evaluate whether nurses are supervisors under
 2(11) but would "treat . . . nurses the same as all other
employee classifications and . . . apply to them the same test as
[that] appl[ied] to all other employees." Ten Broeck Commons, 320
N.L.R.B. at 810. There is no reason, from the facts of this case,
to believe that the Board continues de facto, if not de jure, to
apply a special test to nurses. The Board here has carefully
reviewed the facts, itself evidence that the outcome of this case
was not pre-ordained by the Board. Indeed, Provident does not
really argue this point. Instead, Provident's argument is
basically that the Board's interpretations of particular statutory
phrases establish tests in which matters of judgment tend to be
resolved against the employer, when a more impartial and reasoned
exercise of judgment would be in favor of the employer. If that is
so, then the remedy is in Congress. So long as Congress has
assigned this interstitial policy-making role to the Board, we
adhere to our usual rules of deference. Accord NLRB v. GranCare,
Inc., 170 F.3d 662, 665-66 (7th Cir. 1999) (en banc); see also
Beverly Enterprises, Virginia, Inc. v. NLRB, 165 F.3d 290, 299-302
(4th Cir. 1999) (en banc) (Philips, J., dissenting) (rejecting the
argument that the Board's purported policy bias gives the court a
"licence . . . to skew normal standards of judicial review").
 IV. Analysis
A. The 2(11) Test
 The NLRA at 2(11) defines as a supervisor:
 [A]ny individual having authority, in the interest of the
 employer, to hire, transfer, suspend, lay off, recall,
 promote, discharge, assign, reward, or discipline other
 employees, or responsibly to direct them, or to adjust
 their grievances, or effectively to recommend such
 actions, if in connection with the foregoing the exercise
 of such authority is not of a merely routine or clerical
 nature, but requires the use of independent judgment.

29 U.S.C. 152(11). This definition is disjunctive: any one of
the listed aspects of authority may signify supervisory status, as
long as the exercise of that authority involves the use of
independent judgment. See Telemundo de Puerto Rico, 113 F.3d at
273. The Board has set forth a three-part test to interpret this
statutory definition: (1) whether the individual has the authority
to perform any one of the twelve defined duties, (2) whether
exercising that authority requires the use of independent judgment,
and (3) whether the employee exercises the supervisory authority in
the interest of his or her employer. See Health Care & Retirement
Corp., 511 U.S. at 574. 
B. The Board's Interpretation of "Independent Judgment"
 The Court in Health Care & Retirement Corp. rejected the
Board's "patient care" analysis of the phrase "in the interest of
the employer," noting that "[w]ith respect to that particular
phrase, we find no ambiguity supporting the Board's position." Id.
at 579. However, the Court was careful to point out that the case
before it did not involve certain other phrases in 2(11) which
the Court recognized to be ambiguous. See id. (finding it "no
doubt true" that "phrases in 2(11) such as 'independent judgment'
and 'responsibly to direct' are ambiguous, so the Board needs to be
given ample room to apply them to different categories of
employees"). The ambiguous phrase "independent judgment," which
was "irrelevant" in Health Care & Retirement Corp., id., is at
issue here. 
 The ambiguity of this phrase stems in part from its
similarity to the phrase "consistent exercise of discretion and
judgment" in 2(12) of the Act. See 29 U.S.C. 152(12). The
latter phrase describes the work of professional employees, who are
covered under the Act. See 29 U.S.C. 152(3), (12). The Act's
simultaneous exclusion of supervisors and inclusion of professional
employees creates an inherent tension which the Board and the
courts have tried to resolve since enactment of the Taft-Hartley
Act in 1947. See D. Rabban, Distinguishing Excluded Managers from
Covered Professionals Under the NLRA, 89 Colum. L. Rev. 1775, 1798
(1989); see also D. Barker, Note, NLRB v. Health Care &
Retirement Corp.: Erosion of NLRA Protection for Nurses and Other
Professionals?, 1996 Wis. L. Rev. 345, 346 (1996).
 In the aftermath of Health Care & Retirement Corp., the
Board found there to be a distinction between the "independent
judgment" exercised by statutory supervisors and the judgment
routinely exercised by professional employees. The Board found
that "making decisions requiring expert judgment is the
quintessence of professionalism; mere communication of those
decisions and coordination of their implementation do not make a
professional a supervisor." Providence Hospital, 320 N.L.R.B. at
719. Accordingly, the Board held that where the judgment exercised
by nurses in assigning and directing employees is indistinguishable
from the judgment that professional nurses routinely exercise,
"independent judgment" under 2(11) has not been established. See
id. at 730.
 The Regional Director applied the Providence Hospital
rule in her supplemental decision, which once again found
Provident's district and charge nurses not to be supervisors. On
review, the Board affirmed this conclusion. In arguing against
enforcement of the Board's order, Provident suggests that the
interpretation of "independent judgment" which the Board adopted in
Providence Hospital should be rejected as unfounded.
 We disagree. The Board's interpretation is not
irrational or inconsistent with the statute. To the contrary, it
harmonizes the Act's definitions of "supervisor" and "professional
employee" in a sensible way, consistent with Congress's intent to
exclude as supervisors only those employees with "genuine
management prerogatives." NLRB v. Bell Aerospace Co., 416 U.S.
267, 280-81 (1974). Thus, we do not disregard the Board's
interpretation of this phrase, as Provident urges. Instead we
defer to that interpretation as a "permissible construction" of
ambiguous language. Chevron, 467 U.S. at 843.
C. The Board's Application of the 2(11) Test
 In addition to challenging the Board's interpretation of
"independent judgment," Provident says the Board disregarded record
evidence in its conclusions and ignored substantial evidence
concerning the supervisory authority of the district and charge
nurses. Because Provident makes a manifold attack, we group the
challenges and discuss each separately. Under Board precedent, the
burden of proving supervisor status falls on the party making the
assertion of supervisory status. See Beverly Enterprises--Ohio,
313 N.L.R.B. 491, 496 n.26 (1993). The question of whether that
allocation of burdens is correct is not before us.
 1. Evaluations and Effective Recommendation of Reward
 Provident's keystone argument is that the district and
charge nurses complete annual performance evaluations for the MHAs
and that these evaluations directly determine the level of merit 
wage increases for the MHAs. This, Provident says, means that
these nurses effectively recommend the reward for the MHAs, which
brings them within the statutory meaning of "supervisor." 
 The Board found that "the evidence fails to establish
that the evaluations performed by these nurses directly affect the
employees' job status; therefore, the nurses' role in evaluating
employees is insufficient to confer supervisory status." Hilliard
Dev. Corp., Case 1-RC-20057, at 2 (NLRB Feb. 6, 1997). 
 We describe the Board's conclusions and the employer's
rejoinders. The Board concedes that there is some relationship
between the evaluations by the district and charge nurses and the
award of merit pay in some instances, but says that this
relationship does not suffice to create supervisory status. 
 First, the Board notes that the instances of influence
over merit pay increases are neither universal nor inevitable. 
About half of the MHAs are per diem employees who do not receive
merit pay increases at all. Even among the MHAs who are not per
diems, another group does not receive merit increases because they
are at or near the maximum wage or cap. There was evidence that
these two groups combined constituted more than half of the MHAs in
1992. In 1993, nine of the nineteen MHAs who were otherwise
eligible for merit increases -- that is, who were neither per diem
employees nor had reached Provident's wage cap -- were nonetheless
removed from the merit increase system by an across-the-board
administrative merit increase, without any input from the district
and charge nurses. 
 Provident presents the facts differently. Provident
contends that in 1992, the majority of aides received raises based
on evaluations by the district and charge nurses. Further,
Provident says, in 1993, ten of twenty-three did; of the thirteen
remaining, four were not eligible because they were per diem
employees, and nine received the administrative merit increase,
which was a one-time, atypical event. 
 Second, the Board found it was not clear how many of the
district and charge nurses actually completed evaluations of MHAs
or whether they knew what effect the evaluations would have on the
aides. Nurses who testified said that they did not know their
evaluations would affect the merit increases for the MHAs. 
 Provident says the subsidiary findings to the Board
conclusions are wrong and are not supported by the evidence. As to
the point that only a few nurses completed MHA evaluations (and did
only one or two), Provident says that in 1992 and 1993 all but one
of the nurses completed evaluations; many completed more than one. 
Further, Provident says the Board committed an error of law in
considering the frequency with which evaluations were done. See
Maine Yankee, 624 F.2d at 360 (noting that the question under
 2(11) is whether authority exists, not how frequently it is
exercised). Regarding the Board's statement that it was unclear
whether nurses knew the effect of rankings, Provident says this was
contradicted by the nurses' testimony. 
 Third, and most significantly for our purposes, the Board
found there was no consistent or direct correlation between the
scores received on the evaluations by the charge and district
nurses and the percentage of the merit increases (where awarded). 
There were several reasons for this. The increases awarded did not
always match the evaluation scores given, and the range of merit
pay increases awarded varied from time to time even within a year
due to budgetary factors. In addition, the determination by the
district and charge nurses of the evaluation score was subject to
review by others and to independent assessment by the Director of
Nursing. 
 With respect to the variance in range of increases
received, the Board found that employees with the same ratings, but
who were evaluated at different times of the year, received
different percentage pay increases. The Board refers to several
instances in which specific merit increases awarded by the
administrator had no correlation to the ratings awarded, even under
the formula in effect at the time: in 1992, two MHAs who received
the same evaluation score were awarded different increases, and two
MHAs with different evaluation scores received the same increase,
contrary to the formula in effect at the time.
 As to the responsibility of other supervisory personnel
in the process, the evaluation form itself had a space for the Unit
Manager to fill out. The job description for both the district
nurse and charge nurse positions state that those nurses write the
evaluations "[w]ith the . . . Unit Manager." In fact, both the
Unit Manager and the Director of Nursing review the evaluations. 
The Board relied on the testimony of the Director of Nursing, who
said that while she had never changed an individual rating herself,
if she disagrees with a rating, she will "ask the unit manager to
ask the nurse to redo it again to make sure that's the score they
want to put in." There was also evidence that the independent
evaluation made by the Director of Nursing resulted in higher pay
raises for those who emerged with the same scores from the district
and charge nurse evaluations but whom the Director gave a good
evaluation. 
 As to the Board's conclusion that there was no consistent
or direct correlation between scores received and percentage of
merit increases, Provident responds that this is the inevitable
result of a rolling (year by year) relationship between evaluation
points and percentage increase. Regarding the potential for
intervention in the evaluation process by the nurses' superiors,
Provident says that such intervention rarely occurred. It also
says this point is irrelevant, because the statute only requires
the power to recommend reward. Provident relies on the Sixth
Circuit's decision in Caremore to support this argument. See
Caremore, 129 F. 3d at 369 (concluding that nurses had authority
to recommend reward because they evaluated aides, even though the
nurses' evaluations were subject to administrative review).
 None of the various circuit cases in the wars of the
nurses, described above, turned on the phrase in 2(11) which is
the employer's lead argument here - the authority "effectively to
recommend" reward of other employees. We accept, arguendo, that
the evaluation process requires the use of independent judgment. 
Whether independent judgment is involved in the translation of that
evaluation to a pay increase is a different question. But before
that question of independent judgment is reached there is the prior
question of whether the nurse's authority in this area is the
authority "effectively" to "recommend" a "reward . . . [to] other
employees." This combination of statutory phrases is not so
precise as to rule out Chevron deference. 
 The Board, in turn, has appropriately noted that 2(11)
does not list "evaluate" as a supervisory function. The employee
effectively recommends reward, the Board says, only when an
employee's evaluation leads to pay changes, there is a "direct
correlation" between the evaluations and merit increases or bonuses
to the evaluated employees, and the employee's supervisors do not
independently investigate or change the ratings. See First
Healthcare Corp., 323 N.L.R.B. at 1171-72. The Board has thus
interpreted "effectively recommend" to require a "direct
correlation." This standard is to be given deference because it is
neither irrational nor contrary to the plain language of the Act. 
The question then becomes whether the Board's conclusion that the
standard has not been met itself meets the substantial evidence
standard.
 Two themes undergird the Board's conclusion: that there
is no direct link between the evaluations and merit pay and that
management independently reviews and can change the evaluations. 
Our review of the record shows that substantial evidence supports
the Board's findings on both points. We focus on those themes and
do not reach each individual argument made by Provident.
 There is some merit in Provident's reproach that the mere
use by management of rolling performance evaluations cannot turn a
supervisor into a non-supervisor. If the Board's conclusion rested
on this point, we might well agree with Provident. But we
understand the Board to have concluded something else - that there
really is no direct connection between the evaluation of an MHA
given by a charge or district nurse and the merit pay increase, if
any, that the MHA receives. Management retained and exercised the
power over several intervening factors. The 1993 across-the-board
administrative merit increase serves as an example. Provident
rightly says a one-year exception should not create a rule. We
have no way of knowing, from this record, whether the 1993
administrative merit increase was unique. More importantly, even
in 1992 there was adequate evidence to support the Board's
conclusion that merit pay is not directly linked to the
evaluations. Two MHAs received different merit increases although
they received exactly the same scores; two receiving different
evaluation scores received the same increase. The evaluation
themselves are independently reviewed by the Unit Managers, the
Director of Nursing and the home's administrator. At least once a
nurse was directly told to change a rating; several other times
mere diplomatic suggestions to that effect were made. Management
in fact reviewed and signed every evaluation and the Director of
Nursing entered her own comments on most of the evaluations based
on her own observations. This combination of factors differs from
that in the case relied on by Provident, the Sixth Circuit decision
in Caremore, Inc., and, in our view, suffices.
 2. Assigning and Effectively Recommending 
 Assignment of Work

 Provident also argues that the district and charge nurses
participate in and effectively recommend the assignment of work. 
It makes the following arguments in support of its contention that
the nurses have authority to assign work to the MHAs. It says the
job descriptions provide the nurses with authority to "assign
tasks" to other staff; that the nurses actually assign MHAs to
particular residents (through pre-determined groupings of
residents); that if an MHA is absent, the nurses redistribute the
work among the present MHAs and can ask an MHA to work beyond a
shift or to float; and that the nurses determine when the MHAs take
breaks, including lunch breaks. The employer also focuses on the
fact that the nurses are the highest level of staff physically
present at the nursing home on weekends and at night. Provident
relies on several decisions from other circuits to support these
arguments. See Glenmark Assocs. v. NLRB, 147 F.3d 333, 340-45 (4th
Cir. 1998) (finding nurses had statutory authority to assign work);
Caremore, 129 F.3d at 369 (same); Beverly California Corp., 970
F.2d at 1553 (same). 
 The Board found that while the district and charge nurses
possess some assignment power, the power is circumscribed and does
not amount to the exercise of independent judgment. The Board
placed great weight on the fact that the Unit Managers select
groups of residents for assignment to the MHAs; the nurses' only
authority is to assign MHAs to those predetermined groups. The
Unit Managers also determine the specific duties to be performed
for each resident, as well as the shift or floor to which each MHA
is assigned. Once MHAs are assigned to a group of residents, the
assignments tend to remain the same. As to the occasional
reassignment when MHAs are absent, the Board found that, although
the nurses consider the needs of individual residents, the matching
of skills to requirements was essentially routine. Further, all
floating work or beyond shift work is based on predetermined
requirements that there be a certain number of MHAs per unit. 
While nurses can request that an MHA work overtime, they cannot
compel the MHA to do so. Once nurses do exercise their limited
authority to transfer, they must immediately notify the Unit
Manager, who reviews the decision. Finally, the determination of
order of lunch and other breaks is essentially clerical.
 The Board's conclusion that such hemmed-in, limited
authority to assign work -- authority which is confined by
predetermined groupings and schedules and is subject to post-action
recission by a Unit Manager -- is not the independent judgment
required by the Act is both rational and supported. See Northeast
Utils. Serv. Corp. v. NLRB, 35 F.3d 621, 625 (1st Cir. 1994)
(finding non-supervisory status where employee had no ability to
assign work other than filling openings on a shift from a pre-
determined list). The mere fact that an action is subject to
review and to being countermanded by a higher-up employee does not
alone mean that the acting employee is not a supervisor. See NLRB
v. Metropolitan Life Ins. Co., 405 F.2d 1169, 1177 (2d Cir. 1968)
("[The] power to review held by the immediate supervisors of the
[employees] whose status is at issue does not demonstrate that the
latter are not 'supervisors' under the Section 2(11) definition."). 
But the Board does not rely on that fact alone, and its assessment
of what is routine work as opposed to work requiring the exercise
of independent judgment is adequately supported by the record.
 3. Adjusting Grievances
 The Board found that the nurses can resolve minor
grievances, such as a complaint by an MHA about an assignment. If
the complaint is not resolved, it is brought to the Unit Manager.
 The Board found that this level of activity did not
amount to supervisory authority because management has not granted
the nurses authority to bind management, because implementation of
a remedy for a grievance can only take place if all of the affected
MHAs agree with it, and because the nurses have no power of
enforcement, and, in particular, no power to reassign an MHA in
response to another MHA's complaint without the consent of the Unit
Manager. 
 The Board's conclusion that this limited role did not
involve independent judgment is more than supported. See Northeast
Utils. Servs. Corp., 35 F.3d at 625 (finding employees not to be
supervisors where they can moderate disputes but do not have
ultimate responsibility for the resolution of disputes); Stop &
Shop Cos. v. NLRB, 548 F.2d 17, 20 (1st Cir. 1977) (same).
 4. Disciplining And Effectively Recommending Discipline
 The district and charge nurses do exercise some limited
authority in the area of disciplining and recommending discipline. 
First, they document any instances of patient abuse or
insubordination on forms. Second, the nurses send MHAs home when
they observe certain defined infractions such as intoxication,
fighting, sleeping on the job, or inappropriate dress.
 In the first situation, the nurse will document the
incident on one of the forms provided, which contain no designated
space for the reporter to recommend discipline. Nonetheless, at
times the nurse does include a written recommendation as to
discipline or label an incident as a disciplinary infraction. The
form is given to the Unit Manager and becomes part of the personnel
file of the MHA.
 The Board found there was no authority to discipline
under 2(11), only reportorial authority. Nurses can only report;
others make the actual discipline decisions. This supportable
finding is adequate to sustain the Board's conclusion.
D. The Sum of the Parts and the Whole
 Treating Provident's challenge on a clause by clause
basis under 2(11), we conclude that it has not met its burden,
despite an able challenge. Because an atomized analysis may
mislead, we step back to review the entire picture. Matching the
Board's conclusions against the purposes for the exclusion of
supervisors from the Act, we find no mismatch. Testing the Board's
conclusions against the structure of the workplace, we again find
no mismatch.
 "To achieve a balanced picture, it is important to note
what [the employees at issue] do not do." Telemundo de Puerto
Rico, 113 F.3d at 272 (emphasis added). True supervisors are those
vested with "genuine management prerogatives." Bell Aerospace Co.,
416 U.S. at 280-81; see also 2 P. Hardin, The Developing Labor Law
1610 (3d ed. 1992) (observing that supervisor status derives from
"[t]he power to act as an agent of the employer in relations with
other employees"). The charge and district nurses are not vested
with these prerogatives. For instance, they do not speak for the
organization, set its policies, assert financial control, or
resolve services disputes - all the sort of activities engaged in
by those given true managerial and supervisory authority. 
 The claim that the district and charge nurses are
supervisors rests on their relationship with the aides, who are a
rung below them on the organizational ladder. These charge and
district nurses are primarily care givers. The central
responsibility of these nurses is to care for their patients, and
their supervisory authority over the aides is relatively modest.
That there are employees lower on the organizational ladder whom
higher level employees evaluate and to whom the higher level
employees give some direction surely cannot be enough to make the
higher level employees supervisors. The NLRB has generally and
correctly said that employees who routinely direct other employees
based solely on a higher skill level are not supervisors. 
 The reasons that supervisors are excluded from coverage
under the Act are not offended when employees such as the charge
and district nurses are covered. The exclusion of "supervisors"
from the Act is thought to be of benefit to both management and
labor. It represents the principle "[t]hat an employer is entitled
to the undivided loyalty of its representatives." NLRB v. Yeshiva
Univ., 444 U.S. 672, 682 (1980). The exclusion may also help, "in
part, to protect employees from supervisor influence within the
union's organization." Metropolitan Life Ins. Co., 40 F.2d at
1178. These concerns are not implicated in this situation. There
is no reason to believe that coverage of the district and charge
nurses would lead to the inherent conflict of interest which
results when a true supervisor must both represent the employer and
bargain against it. Further, there is little reason to believe
that involvement in collective bargaining will transform these
professional nurses into categorically different employees,
disloyal in some sense to their employer and unfit for the original
purpose for which the employer hired them. Cf. Rabban, 89 Colum.
L. Rev. at 1817 (discussing the possibility that a unionized
university professor would become a "transformed employee," who
would "sacrific[e] the professionalism for which he was hired to
the collective security and adversarial posture of the union
movement").
 The structure of the organization also supports the
Board's determination. This is a small nursing home, providing
service at full capacity to 112 patients. The management of the
home is primarily handled by four nurses: the Director of Nursing
and three Unit Managers. Basic, non-professional services are
provided by thirty aides. In between are thirteen district and
charge nurses. It would be an odd managerial and supervisory
structure to have the care of 112 patients entrusted to thirty non-
professionals and have seventeen supervisors or managers, all of
whom are nurses and professionals. See Children's Habilitation
Ctr., Inc. v. NLRB, 887 F.2d 130, 132 (7th Cir. 1989) (using the
ratio of supervisory to non-supervisory employees as a "guiding
light[] in charge-nurse cases"); see also Beverly Enterprises--
Minnesota, Inc., 148 F.3d at 1047. This case is not in the least
like Maine Yankee, where this court reversed a determination of
non-supervisory status for six employees who were in overall charge
of a nuclear plant's nerve center, accountable for any plant
failures and given the responsibility to independently direct the
employees in the department. See Maine Yankee, 624 F.2d at 355-65. 
We do not discount the importance of the role played by district
and charge nurses, who care for those in great need. But important
roles are played by many people who are not supervisors.
 For these reasons, we grant the Board's petition and
enforce the Board's order.