**EDWARD STREET DAYCARE CENTER, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 98–2184.

United States Court of Appeals, First Circuit.

Heard May 7, 1999.

Decided Aug. 20, 1999.

Barry A. Bachrach, with whom Duane T. Sargisson was on brief for petitioner.

John D. Burgoyne, Acting Deputy Associate General Counsel, with whom Charles Donnelly, Supervisory Attorney, Sonya Spielberg, Attorney, Frederick L. Feinstein, General Counsel, and Linda Sher, Associate General Counsel, National Labor Relations Board, were on brief for respondent.

Before STAHL, Circuit Judge, KRAVITCH,* Senior Circuit Judge, and LIPEZ, Circuit Judge.

LIPEZ, Circuit Judge.

The Edward Street Daycare Center (the Center) petitions us to set aside a final order of the National Labor Relations Board (the Board) requiring the Center to cease and desist from its refusal to bargain with Truck Drivers Union Local 170, affiliated with the International Brotherhood of Teamsters, AFL–CIO (the Union) as the exclusive bargaining representative of the employees in the bargaining unit. The Board cross-petitions for enforcement of its order. After reviewing the record as a whole, we conclude that the Board's decision is supported by substantial evidence. We therefore deny the Center's petition, grant the Board's cross-petition, and order enforcement of the Board's order pursuant to the National Labor Relations Act (the Act). We begin our explanation with the procedural background.

*I. Procedural History*

In March 1998, the Union filed a petition with the Board seeking to be certified as the exclusive collective bargaining representative for all non-supervisory employees of the Center, a day care center in Worcester, Massachusetts that serves approximately 93 children "in developmental-

* Of the Eleventh Circuit, sitting by designation.

ly appropriate settings so the families can work or receive training for employment opportunities." The Center is open five days a week, 52 weeks a year and employs approximately 23 people (both full and part time). The Center challenged the Union's petition, claiming that the Union's proposed bargaining unit was inappropriate because it included three Head Teachers and the Coordinator of Billing and Operations, all allegedly supervisors within the meaning of the Act.[1]

On March 20, 1998, a hearing officer employed by the Regional Director for the First Region of the Board held a hearing as the Board's designee. Following that hearing, the Regional Director issued a Decision and Direction of Election on April 15, 1998, concluding that the Center had not established that the Head Teachers or the Coordinator of Billing and Operations were supervisors under the Act.[2] Consequently, the Regional Director certified an exclusive bargaining unit including "[a]ll full time and regular part-time head teachers, assistant head teachers in training, teachers in training, the coordinator of billing and operations, the cook, the assistant cooks, maintenance and housekeeping employees, and the bookkeeper."[3] The Center sought review of the Regional Director's decision before the Board but such review was denied on May 13, 1998, because the Board determined that the Center raised "no substantial issues warranting review." An election was held on May 15, 1998, in which (1) the professional employees (the head teachers) voted to be included in a bargaining unit with the nonprofessional employees, and (2) the Center's employees voted for the Union by a margin of fifteen to two. On May 27, 1998, the Board certified the Union as the bargaining unit's exclusive representative.

■ The dispute then took a familiar path. Employers cannot obtain direct judicial review of union certification decisions. Therefore, "if an employer is dissatisfied with the outcome of a representation proceeding, the option of choice is to refuse to bargain and to raise any infirmity in the certification decision as a defense to the unfair labor practice charge that almost inevitably will ensue." *Telemundo de Puerto Rico, Inc. v. NLRB*, 113 F.3d 270, 272 (1st Cir.1997). The Center refused to bargain with the Union because of its objection to the certification of the bargaining unit. In response, the Union filed an unfair labor practice charge. The Board's Acting General Counsel issued an unfair labor practice complaint alleging that the Center had violated section 8(a)(1) and (5) of the Act (29 U.S.C. §§ 158(a)(1) & (5)) by refusing to recognize and bargain with the Union. The Center responded to the complaint by admitting that it refused to bargain and defending that refusal by challenging the validity of the certification on the basis of the Board's bargaining unit determination in the representation proceeding. Specifically, it claimed that the Head Teachers and the Coordinator of Billing and Operations were supervisors under the Act.

The Acting General Counsel filed a motion for summary judgment, contending that the Center was merely attempting to relitigate matters which previously had been considered and upheld by the Board

---

1. The Center originally claimed that Assistant Head Teachers were also supervisors and therefore were also inappropriate to include in a bargaining unit. The Center does not pursue this argument on appeal.

2. The hearing officer merely takes evidence and creates the record. The Regional Director then makes findings and conclusions on the basis of the record compiled by the hearing officer.

3. This unit was approved conditionally because it included "professional employees," i.e., the head teachers. Because the professional employees voted to be included in the bargaining unit with the non-professional employees, the condition for their inclusion was met and this is the bargaining unit at issue.

in the representation proceeding. On September 14, 1998, the Board issued a notice to Show Cause why the summary judgment motion should not be granted. In response, the Center reiterated its position that the earlier representation decision was erroneous because of the alleged supervisory status of the Head Teachers and the Coordinator of Billing and Operations. The Center also asked the Board to consider the affidavit of the Center's Coordinator for Social Services/Training, who had allegedly been unavailable to testify at the representation hearing.

On September 30, 1998, the · Board granted the Acting General Counsel's motion for summary judgment, ruling that all issues raised by the Center "were or could have been litigated in the prior representation proceeding," that the Center did not adequately explain why its so-called "new evidence" was not adduced at the representation hearing, and that it did not allege any special circumstances that would require the Board to reexamine the decision made in the representation proceeding. The Board concluded that the Center had engaged in an unfair labor practice, and ordered the Center to recognize and bargain with the Union. This appeal ensued.

## II. Challenges to the Decision–Making Process

We begin our legal analysis by considering two challenges to the way in which the Regional Director and the Board disposed of this case. First, the Center complains that the Regional Director, in making her supervisory status determinations, abdicated her responsibility to make credibility determinations. The Center notes in particular this statement in the Regional Director's decision:

> Whenever the evidence is in conflict or otherwise inconclusive on particular indicia of supervisory authority, the Board will find that supervisory status has not

been established.... In regard to the [H]ead [T]eachers, much of the evidence is in dispute and is, therefore, unreliable for establishing supervisory authority....

Contrary to the parties' urgings, I do not make credibility determinations regarding such contradictions in the evidence and, instead, look to examples of supervisory authority being exercised.

The Center argues that this approach means that "an employer could never demonstrate supervisory status if the Union introduced contradictory evidence regardless of the quality or credibility of that evidence."

■ The Center raises a potentially important issue which was never presented to the Board during the unfair labor practice proceedings. This omission is fatal to the consideration of this issue here. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982) (holding that "the Court of Appeals was without jurisdiction to consider th[e] question" because "[t]he issue was not raised during the proceedings before the Board, either by the General Counsel or by [the employer]"); *accord Pegasus Broad. of San Juan v. NLRB*, 82 F.3d 511, 514 (1st Cir.1996); *Local Union No. 25 v. NLRB*, 831 F.2d 1149, 1155 (1st Cir.1987). The Board noted in its decision granting the Acting General Counsel's motion for summary judgment that the Center did not allege any special circumstances that would require the Board to reexamine the decisions made by the Regional Director in the representation proceeding. That was a missed opportunity that we cannot remedy here.[4]

---

4. In its brief to this court, the Board did not respond directly to the argument that its procedure was flawed because of the refusal of the Regional Director to make credibility de-

■ The Center also assigns error to the Board's decision not to consider the affidavit of the Center's Coordinator of Social Services/Training which was proffered to the Board for the first time in response to the unfair labor practice charge. The Board refused to consider the affidavit, citing to its regulation prohibiting the relitigation of issues which could have been contested in the original representation proceeding absent exceptional circumstances. *See* 29 C.F.R. § 102.65(e)(1); *see also Pittsburgh Plate Glass Co. v. NLRB,* 313 U.S. 146, 162, 61 S.Ct. 908, 85 L.Ed. 1251 (1941). The Center offers nothing exceptional to explain why this affidavit should be considered new evidence, merely stating that the Coordinator for Social Services/Training "was out of state and not available for the initial hearing." We have previously stated that this exception for new (or newly available) evidence "should be invoked sparingly, and a court should hesitate to second-guess the Board's assessment that particular circumstances do not qualify for it." *Telemundo,* 113 F.3d at 276–77. We have no occasion to second-guess the Board's determination in this instance; the Center did not establish the type of exceptional circumstance which requires a remand to re-open the record.

*III. The Supervisory Status Determinations*

A. The Legal Framework

■ The Center challenges the Board's determinations that particular employees are not "supervisors" within the definition of the Act. Because supervisors "must represent the interests of their employer rather than the interests of their coworkers,"

*Telemundo,* 113 F.3d at 273, supervisors "may not be included in a bargaining unit designated by the Board." *Northeast Util. Serv. Corp. v. NLRB,* 35 F.3d 621, 624 (1st Cir.1994). The Act defines a "supervisor" as "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11). "Because the [Act] is to be read in the disjunctive, any one of the enumerated powers may signify supervisory status." *Telemundo,* 113 F.3d at 273. Nevertheless, because "Congress intended to exclude 'straw bosses,' 'lead men,' and other low-level employees having modest supervisory authority from supervisor status .... even an enumerated power must involve the exercise of independent judgment in order to brand the holder of the power as a supervisor." *Id.* at 273–74 (internal quotation marks omitted). Moreover, "[b]ecause of the serious consequences of an erroneous determination of supervisory status, particular caution is warranted before concluding that a worker is a supervisor despite the fact that the purported supervisory authority has not been exercised." *Beverly Enterprises— Mass., Inc. v. NLRB,* 165 F.3d 960, 963 (D.C.Cir.1999); *see also NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 280–81, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974) (noting Congress' intent to exclude only those supervisors who possess "genuine management prerogatives").

terminations. At oral argument, the Board did note that this argument was not properly before the court because the Center had not presented it to the Board. However, even if the Board had neglected this argument altogether we would in all probability refuse to take cognizance of it because § 160(e) "speaks to courts, not parties, and its plain language evinces an intent that the [Board]

shall pass on issues arising under the Act, thereby bringing its expertise to bear on the resolution of those issues." *EEOC v. Federal Labor Relations Auth.,* 476 U.S. 19, 23, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986) (construing "virtually identical" language in the Civil Service Reform Act and citing *Woelke,* 456 U.S. at 665–66, 102 S.Ct. 2071).

The determination of supervisory status *vel non*, tinged as it is with policy implications, is within the particular expertise of the Board. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (characterizing the Board as "one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of expertness which courts do not possess and therefore must respect"). "Given the myriad iterations of authority that are possible and the subtle distinctions that easily can be drawn, courts must afford great deference to the Board's expert determination of which workers fall into which classification." *Telemundo*, 113 F.3d at 274. We may not disturb the Board's findings as to which employees are supervisors and which are not "unless those findings fail to derive support from substantial evidence in the record as a whole." *Id.* (citing *Universal Camera*, 340 U.S. at 488, 71 S.Ct. 456); *see also Northeast Util.*, 35 F.3d at 625 (recognizing that the Board is entitled "to wide latitude in determining which employees fall within the definition of 'supervisor'"). "Under Board precedent, the burden of proving supervisor status falls on the party making the assertion of supervisor status." *NLRB v. Hilliard Dev. Corp.*, 187 F.3d 133, 143 (1st Cir.1999); *see also Beverly Enterprises—Mass., Inc.*, 165 F.3d at 962; *St. Alphonsus Hosp.*, 261 N.L.R.B. 620, 624 (1982), *enforced*, 703 F.2d 577 (9th Cir.1983).

With these legal principles framing the analysis, we examine the evidence underlying the Board's supervisory status determinations, drawing all "supportable inferences in a manner consistent with the Board's findings." *Hilliard Dev. Corp.*, 187 F.3d at 137. Of necessity, this examination requires an extensive marshaling of the facts. "[T]he details of the [putative

supervisor's] functions are critical in ascertaining whether he is a supervisor as that term is defined" in the Act. *See Maine Yankee Atomic Power Co. v. NLRB*, 624 F.2d 347, 359 (1st Cir.1980).

### B. The Record

#### 1. Overview

The Center is run by its Executive Director, Doryl Rourke, who reports to the Center's Board of Directors, which sets job descriptions and personnel policies. Any new policies or changes in policy are communicated by the Board to Rourke, who is responsible for disseminating the information to her staff. An organizational chart introduced into the record by the Center shows the Coordinator of Billing and Operations, the Coordinator of Social Services/Training, and the Bookkeeper reporting directly to the Executive Director. The maintenance workers and the cooking staff report to the Executive Director through the Coordinator of Billing and Operations. According to the chart, the Head Teachers report to the Executive Director through the Coordinator of Social Services/Training.[5] The rest of the teaching staff reports through the Head Teachers.

#### 2. The Coordinator of Billing and Operations

The Board found that the "evidence is scant regarding *any* indicia of supervisory authority" for the Coordinator of Billing and Operations (the Coordinator) (emphasis in original). The Center contends that the Coordinator is a supervisor because she has the authority (1) to adjust grievances and to discipline other employees and (2) to assign work and to responsibly direct other employees. We examine those claims in turn.[6]

---

5. It is undisputed that the Coordinator of Social Services/Training is a supervisor.

6. Only Rourke testified about the Coordinator's responsibilities; the Coordinator was not called to testify by either party. Therefore, the record with regard to the Coordinator is

### a. Adjustment of Grievances and Discipline

■ The Center points to its Employee Handbook as evidence that the coordinator has the authority to adjust grievances. The Handbook does state that an employee's "supervisor" is the first step in the grievance process, but there is no indication that the Coordinator is a "supervisor" under the terms of the Handbook. Moreover, Rourke admitted that the Coordinator has never adjusted a grievance. *See Beverly Enterprises—Mass., Inc. v. NLRB*, 165 F.3d 960, 963 (D.C.Cir.1999) ("[A]bsent exercise, there must be other affirmative indications of authority."); *see also Chevron, U.S.A., Inc.*, 309 N.L.R.B. 59, 69 (1992) (stating that no weight is given to "job descriptions that attribute supervisory authority where there is no independent evidence of its possession or exercise."). The evidence with respect to discipline is equally equivocal; while Rourke testified that the Coordinator has the authority to discipline the maintenance employees and the cook, she admitted that the Coordinator has never exercised this authority in the six years the position has been in existence, and there are no other affirmative indications of the Coordinator's actual authority to discipline.

### b. Assignment and Direction

■ Rourke testified that the cook works "fairly independently." The only indicia of the Coordinator's supervision of the cook is her responsibility, "[i]n con-junction with the Executive Director," to "monitor [the] menus in accordance with U.S.D.A. standards." Although Rourke testified that the coordinator reviews the menus and "discuss[es]" them with the cook, she went on to testify that "[i]f there's any question, they would come to [the Executive Director.]"

With respect to the maintenance staff of two, the Coordinator does nominally "assign" work to them. Although the Coordinator has some role in prioritizing the requests for maintenance, Rourke testified that the prioritizing is a cooperative process due to the experience of the regular maintenance worker, prompting the Board to conclude that the maintenance worker "often participates in the discussion of how to prioritize work, what to order to do the job, and how to do the work." The other maintenance employee, who is primarily responsible for housekeeping, works "off hours" and on weekends. The Coordinator rarely sees him; their contact is mainly over the telephone. *See Telemundo*, 113 F.3d at 274 (rejecting inference of supervisory authority where the subordinates "require[d] minimal supervision"). If the Coordinator receives a complaint that requested work has not been completed, the Coordinator calls the employee to inquire into the reason(s) why. However, Rourke testified that the Coordinator does not write up the omissions as infractions and generally does not assign unfinished work to the other maintenance worker, though if

limited to Rourke's testimony and the documentary evidence offered by the Center, which included a job description listing the Coordinator's duties as follows:

1. Maintains client data base in order to submit monthly billing for state/federal contracts in accordance with all promulgated policies and procedures.
2. Responsible for management of all aspects of employee benefits, including group health/dental, disability, and unemployment services.
3. Responsible for management of agency's insurance policies, including workers compensation, client, and staff accident policies.
4. Coordinates housekeeping and general maintenance and capital improvements to the facility; oversees agency, staff, and outside contractors.
5. In conjunction with the Executive Director, coordinates nutrition staff including monitoring of menus in accordance with U.S.D.A. standards.
6. Coordinates ordering of and inventories general consumable supplies for maintenance, nutrition, classroom and office use.
7. Assists with the coordination of summer program transportation.
8. Attends seminars, inservice training and staff meetings as required.

she did, "she would tell me [the Executive Director] that she did that, but she has the authority to do it."

To be considered indicative of supervisory status, the authority to assign and direct has been held necessarily to include the responsibility "to be answerable for the discharge of a duty or obligation." *Maine Yankee Atomic Power Co. v. NLRB*, 624 F.2d 347, 361 (1st Cir.1980) (quoting *Ohio Power Co. v. NLRB*, 176 F.2d 385, 387 (6th Cir.1949)). The evidence presented to the Board fails to demonstrate that the Coordinator is held accountable for the performance of the maintenance workers or the cook, or for their failure to perform. Therefore, the Center's evidence falls short of establishing the Coordinator's supervisory responsibility in this regard. *See Telemundo*, 113 F.3d at 275 ("[T]he record contains no compelling evidence that [the purported supervisor] is held accountable for the adequate performance of [the putative subordinates'] work. This distinction makes a world of difference.").

Finally, Rourke testified that the Coordinator had the authority to grant maintenance employees time off. No examples were provided, however, and Rourke also testified that "[t]ime off is dictated by a policy within the whole agency" and that the Coordinator of Social Services/Training "does the scheduling for the staff." Moreover, the Board found that the Executive Director's testimony was directly contradicted by the Employee Handbook, which states that vacations may be taken "as arranged by the Director."

As we stated in *Telemundo*, "the mere fact that an employee gives other employees instructions from time to time does not in and of itself render him [or her] a supervisor under the Act." *Telemundo*, 113 F.3d at 274. The evidence must show that such employees "possess authority to exercise independent judgment in overseeing other employees." *Id.* A review of the entire record reveals substantial evidence to support the Board's finding that the Coordinator does not exercise independent judgment as a supervisor, as required by the Act.

### 3. The Head Teachers

The members of the Center's staff that are assigned to the six classrooms are divided into three "teams." Each Head Teacher leads one team, consisting of her or his classroom's staff plus one other classroom. An Assistant Head Teacher (or an Assistant Head Teacher in Training) runs the other classroom. In addition, the teaching complement in each classroom also includes one and sometimes two other teachers. These secondary teachers are either Assistant Head Teachers in Training, Assistant Teachers, or Assistant Teachers in Training. The Center contends that the Head Teachers satisfy the Act's "supervisor" definition by (1) assigning work and directing subordinates; (2) having authority to adjust grievances and discipline other employees; and (3) providing written evaluations of other teachers. We take each claim in turn.[7]

7. The evidence on the Head Teacher's supervisory status was hotly contested. Again, Rourke testified for the Center. The Union called two additional witnesses: Head Teacher Gloria Johnson and Assistant Head Teacher in Training Nancy Nordstrom. The Center also presented a job description for the Head Teachers, which lists the duties of a Head Teacher as follows:

1. Coordinates work of teaching staff with agency personnel and consultants.
2. Maintains documentation and record keeping required by Office for Children, other social services and funding sources.
3. Supervises incoming team staff including assistants, aides and interns.
4. Has daily contact with Assistant Teacher.
5. Designates person on team in charge whenever absent from the agency.
6. Assumes responsibility for coverage whenever a member of team is absent.
7. Has regular conferences with Coordinator of S.S./Training.

### a. Assignment and Direction

#### i. *In the Classroom*

 The Head Teachers obviously exercise some supervisory control over their classrooms. However, the Board "has generally and correctly said that employees who routinely direct other employees based solely on a higher skill level are not supervisors." *Hilliard,* 187 F.3d at 147–48. The issue is whether they exercise "independent judgment" on behalf of the employer in the discharge of these responsibilities. 29 U.S.C. § 152(11).

Rourke asserted that relatively little direction is ordered by central administration (i.e., the Executive Director and the Coordinator of Social Services/Training) and that "generally, the buck stops with the [H]ead [T]eacher" on matters of classroom administration. Rourke also testified that Head Teachers are responsible for implementing the policies which are announced at the planning meetings (attended by the Executive Director, the Coordinator of Social Services/Training, and the Head Teachers). This implementation, she asserts, requires the Head Teachers to assign tasks to their subordinates and to direct them on execution of these tasks. Johnson, the Head Teacher, and Nordstrom, the Assistant Head Teacher in Training, described a more collaborative approach. The Board characterized Johnson's and Nordstrom's testimony as establishing "that the Head Teachers do not order or direct anyone to perform certain tasks, they solicit ideas on how to implement the curriculum directives in their classrooms." This finding is amply supported in the record.

Also, the Board found that the Coordinator of Social Services/Training "observes the classrooms and instructs the teachers, including the [H]ead [T]eachers, regarding changes she wants made. [The Coordinator of Social Services/Training] has the authority to call teachers into her office and tell them to make changes, and she has done this with all levels of teachers, including those below the level of [H]ead [T]eacher, and without the [H]ead [T]eachers' involvement." The Executive Director admitted that she, too, has exercised her authority to disregard the Head Teachers and to instruct subordinate teachers directly. Such direct oversight by management without the participation or knowledge of the employee's "supervisory" Head Teacher is inconsistent with the Head Teachers' purported authority to "responsibly direct subordinate teachers." *See Maine Yankee Atomic Power Co. v. NLRB,* 624 F.2d 347, 361 (1st Cir.1980) ("To be responsible is to be answerable for the discharge of a duty or obligation." (quoting *Ohio Power Co. v. NLRB,* 176 F.2d 385, 387 (6th Cir.1949))).

Both sides point to a letter from the Coordinator of Social Services/Training to Head Teacher Johnson dated March 3, 1998. The letter instructed Johnson that she must "keep [her] porch closed during the morning but [that she] may choose to open it in the afternoons;" asked her to "please remember good developmental practice suggests you keep yourself at children's level;" and directed her to "[c]ontinue to have one group eat in the room whenever possible. If you find you need your lunch time changed, please let me know and we will make some accommodations. You may also want to think about a better time for other team members to take morning break if coverage is an issue." While the letter could be construed to support some supervisory responsibility for the Head Teachers, the oversight and direction of such minutiae by the Coordinator of Social Services/Training supports the Board's finding that Head Teachers are not authorized to exercise independent judgment in carrying out their supervision.

8. Keeps the workspace and classroom area appropriately neat, tidy and conducive to a safe learning environment.

9. Coordinates weekly team meetings.
10. Initiates parent conferences.
11. Attends staff and parent meetings.

### ii. Authority to Set Schedules

While the Head Teacher job description and some of Rourke's testimony support the position that the Head Teachers exercise supervisory authority over the schedules of their subordinates, other evidence supports the Board's contrary conclusion. Johnson and Nordstrom testified that the team sets the schedule cooperatively and that any modifications are made exclusively on a voluntary basis. Johnson testified that, to the extent a staff coverage issue had to be resolved through an involuntary assignment, she would have to consult Rourke for direction. See Telemundo, 113 F.3d at 276 (noting that "the Board's determination is wholly consistent with the [putative supervisor's] stated self-perception that they are crew leaders, no more"). As for substitutes and arrangements for covering absent teachers, Johnson testified that she possessed no authority to contact substitutes. As evidence, she said that she had no knowledge of who was covering her classroom at the time that she was testifying. She had called and informed the Center that she was taking the day off for personal reasons. She had no further responsibility or authority to address the situation.

### iii. Authority to Grant Time Off

Although Rourke testified that Head Teachers could (and did) authorize subordinates to take time off, she also testified that all requests for time off are handled by the Coordinator of Social Services/Training. Johnson testified that she had no authority to authorize any time off. At one point in the hearing a distinction was drawn between regular time off and vacation time (apparently based on the duration of the requested leave time), but there was no dispute that vacation was authorized through a bid process administered by the Coordinator of Social Services/Training; no one contends that Head Teachers exercise supervisory authority over vacation time. Finally, conflicting evidence was offered on the authority to grant compensatory time for overtime. The Employee Handbook states that "[e]mployees working beyond their regular hours ... may adjust their hours on another day with approval of their supervisor." Again, the Handbook makes no attempt to define who is a "supervisor." Rourke asserted that Head Teachers in fact possessed this authority, but provided no examples. Johnson testified in direct contradiction, stating that Head Teachers "can't make any decisions about comp[ensatory] time."

### iv. Authority to Operate the Center

The Center argues that Head Teachers must have authority to responsibly direct other employees because Head Teachers are occasionally left in charge of the Center. Rourke and Johnson both testified that in the absence of the Executive Director and the Coordinator of Social Services/Training, a Head Teacher is nominally left "in charge" of the Center. According to Johnson, however, when a Head Teacher is left in charge he/she is "not allowed to make any decisions." Instead, Johnson testified that if a problem arises while a Head Teacher is nominally "in charge," the Head Teachers have been given specific instructions to contact the Executive Director or the Coordinator for Social Services/Training, "and if they're not available, then someone on the Board of Directors is to be contacted."

We have previously held that the "spasmodic and infrequent assumption of a position of command and responsibility does not transform an otherwise rank and file worker into a supervisor." Fall River Sav. Bank v. NLRB, 649 F.2d 50, 54 (1st Cir.1981) (quoting NLRB v. Quincy Steel Casting, 200 F.2d 293, 296 (1st Cir.1952)); accord Telemundo, 113 F.3d at 275. The Board was justified in refusing to find supervisory status on the basis of this occasional, nominal authority.

### b. Adjustment of Grievances and Discipline

It is unclear from the record whether Head Teachers have the authority to redress grievances. The Employee Handbook simply states that an employee should initiate the grievance process by first "(d)iscuss[ing] the matter with his/her immediate supervisor." The Employee Handbook, however, contains no material defining "immediate supervisor." Indeed, Assistant Head teacher Nordstrom testified that while she was on Johnson's "team," Rourke was her supervisor. Given the testimony that the Coordinator of Social Services/Training instructed subordinate teachers directly without the involvement of Head Teachers, she could reasonably be considered an "immediate supervisor" under the plan as well.

While neither Rourke nor Johnson could recall any specific grievances, they had conflicting views as to how grievances were to be handled. Rourke reiterated the Handbook's policy that "the first line" in the Center's grievance procedure is for an employee to address his/her grievance to the "supervisor." At another point, Rourke testified that employees should address their grievances "to whomever, whether it be a teacher or whether, with whom they have an issue...." Johnson, like Rourke, could not remember a particular grievance but stated that subordinate teachers' grievances go directly to Rourke.

The evidence on the issue of discipline follows a similar uncertain course. Without setting up a detailed procedure, the Employee Handbook offers the statement that "Supervisors are the key people in ensuring that [the Center's] standards and rules are observed and are responsible for appropriate action for any violation of the standards and rules as set forth by the [Center]." Again, the record is devoid of any instances where such authority has actually been exercised by a Head Teacher. The Executive Director did not speak to the Head Teachers' role in discipline *per se*, but did make references to the Head Teachers' responsibility "to make sure that her subordinate is doing what is directed." Later, the Executive Director stated that the "role [of the Head Teacher] is to make sure that the classroom runs smoothly, that the people are reporting to work on time ... that they're doing what their, what their assigned duties are, and that if they're not, it is also [the Head Teachers'] responsibility to make sure that in some way this happens, either by reprimand, either by bringing it to my attention and dealing with it herself or sitting down with the person." At another point in her testimony, Rourke stated that in supervising subordinate teachers, Head Teachers have the ability to "observe their teaching ability, to make suggestions and comments, ... [and] to come to [the Executive Director] if they feel there is a larger issue." This evidence is equivocal on whether Head Teachers have disciplinary authority. Johnson, however, was unequivocal in her insistence that as a Head Teacher she has no disciplinary authority. Johnson insisted that Rourke administered discipline at the Center. Understandably, on this record, the Board was uncertain about the disciplinary role of the teachers.

### 4. Evaluations

It is undisputed that Head Teachers prepare written evaluations of subordinate teachers on their "teams." However, the frequency and the significance of these evaluations were disputed. While the Center's written policies called for annual evaluations, Johnson testified that she had not evaluated any of her subordinate teachers in the preceding two to three years. Rourke confirmed that "it might go two or three years before [employees are] evaluated." Rourke also testified that "evaluations have nothing to do with whether somebody gets a raise or doesn't get a raise" and that "[a]cross-the-board raises are voted by the Board on an annual basis." Nevertheless, the Center argues that evaluations "are placed in the employee's personnel files," and that this fact

alone "demonstrates the importance of the evaluations and supports the supervisory status since the evaluations are reasonably calculated to affect the employee's status." The Center relies on *NLRB v. Beacon Light Christian Nursing Home*, 825 F.2d 1076 (6th Cir.1987), to support this proposition.

*Beacon Light* is unavailing. There, the allegedly supervisory nurses were "expected and encouraged to [utilize evaluation and discipline forms] routinely," and "[t]hree or four such citations could result in formal disciplinary action including discharge, suspension or demotion." *Beacon Light*, 825 F.2d at 1079. The authority of the disputed supervisors to "effectively recommend" employment decisions based on their own independent judgment, a hallmark of supervision under 29 U.S.C. § 152(11), was clear evidence of supervisory authority. *See id.* Here, the evidence allowed the Board reasonably to find that such evaluations "have no impact on wages, promotions, or other terms and conditions of employment." *See Hilliard*, 187 F.3d at 144–45.

## IV. Conclusion

We are mindful of the difficult judgments these fact-intensive cases require. The evidence supporting the Board's decision is close, particularly on the status of the Head Teachers. This closeness makes deference to the Board especially appropriate. "It is particularly in the close cases that judges, who are generalists, should respect the specialized knowledge of the Board and accede to its factbound determinations as long as they are rooted in the record." *Telemundo*, 113 F.3d at 276. In the final analysis, the Board's determinations that the Coordinator of Billing and Operations and the Head Teachers are employees and not supervisors are supported by substantial evidence on the record as a whole.

Accordingly, we **deny** the petition for review, **grant** the cross-petition, and **enforce** the Board's order.