# United States Court of Appeals
## For the First Circuit

No. 03-2734

HOSPITAL GENERAL MENONITA,
Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent, Cross-Petitioner,

and

FEDERACIÓN CENTRAL DE TRABAJADORES UFCW LOCAL 481,
Intervener.

PETITION FOR REVIEW AND CROSS-APPLICATION
FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

Before

Torruella, Lipez, and Howard,
Circuit Judges.

Julio I. Lugo-Muñoz, with whom Lespier, Muñoz Noya & Rivera, was on brief, for petitioner.
Ruth E. Burdick, Attorney, with whom Robert J. Englehart, Supervisory Attorney, Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, were on brief, for respondent.
Renee L. Bowser, was on brief, for intervener.

December 23, 2004

**TORRUELLA**, <u>Circuit Judge</u>.  This case is before us on the petition of Hospital General Menonita ("Hospital") to review, and the cross-application of the National Labor Relations Board ("Board") to enforce, a Board order against the Hospital.  The Board's Decision and Order was issued on November 26, 2003, and is reported at 340 N.L.R.B. 133 (2003).

## I.  <u>Preliminary shadow boxing</u>

The Board's Order is based in part on findings made in the underlying representation proceedings in Board Cases Nos. 9-RC-17602 and 24-RC-8204.  In those proceedings, the Federación Central de Trabajadores, UFCW, Local 481, AFL-CIO ("Union"),[1] filed a representation petition with the Board seeking to represent a bargaining unit composed of the Hospital's registered nurses ("RNs").  The request was opposed by the Hospital, which alleged that the RNs were statutorily excluded from the provisions of Section 9 of the Act, 29 U.S.C. § 158 (regulating representation of employees by labor organizations for collective bargaining purposes), by reason of their supervisory status within the meaning of that term as defined in Section 2(11) of the Act.  29 U.S.C. § 152(11).[2]  A hearing was held, in which evidence was taken.  As

---

[1]  A "labor organization" within the meaning of Section 2(5) of the National Labor Relations Act, as amended, 29 U.S.C. §§ 151 <u>et seq.</u> ("Act").

[2]  "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other

a result of the hearing, the Board's Regional Director issued a decision to the effect that the RNs were not supervisors but were employees entitled to Section 9 representation, and ordered an election to determine whether a majority of the employees in a unit composed of RNs would choose to be represented by the Union for collective bargaining purposes. The Hospital filed a timely request for review of the decision.

This request did not stay the election, and on March 21, 2002 the Regional Director of the Board conducted a secret-ballot vote among "[a]ll registered nurses employed" at the Hospital's facility in Cayey, Puerto Rico. Pending resolution of the request for review, however, the ballots were impounded by the Regional Director.

In addition to the issue of the supervisory status of the Hospital's RNs, the Hospital filed a timely objection to the conduct of the election itself. The Hospital claimed that its outcome was faulty by reason of conduct, which it attributed to the Union, consisting of the circulation of electioneering material that the Hospital claimed gave the eligible voters the impression that the Board favored the Union.

employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11).

Meanwhile, on April 3, 2002, the Board, by a vote of 2-1 (with its Chairman dissenting) denied the Hospital's request for review, and ordered that the impounded votes be opened and counted. The result of the tally of ballots was 49 votes cast for the Union and 45 against, the Union thus winning a majority result.

Thereafter, a hearing was conducted at which evidence was adduced regarding the Hospital's objection to the election. On August 9, 2002, the Regional Director issued a report and recommendation denying the objection to the conduct of the election. The Hospital filed timely exceptions, which were denied by the Board on August 6, 2003, and thereafter, the Union was certified by the Board as the exclusive bargaining agent of the RNs.

On August 13, 2003, the Union requested that the Hospital meet to commence negotiations for a collective bargaining agreement, which request was rejected by the Hospital. Based on this refusal, the Union filed unfair labor charges with the Board alleging violation of Sections 8(a)(1) and (5) of the Act.[3] The Regional Director issued a complaint against the Hospital, which responded by admitting its refusal to bargain, claiming as a

---

[3] "It shall be an unfair labor practice for an employer -- (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . . (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C. 158(a)(1), (5).

defense the invalidity of the Board's certification based on its assertion regarding the supervisory status of the RNs and its contention that the Union's misconduct during the election process had tainted the election results.  The Board's General Counsel filed a motion for summary judgment, which was granted by the Board on November 26, 2003, with the Board concluding that the issues raised by the Hospital had been properly decided in the course of representation proceedings.  The Board thus found that the Hospital had committed an unfair labor practice in violation of Sections 8(a)(1) and (5) of the Act by refusing to bargain with the Union, and ordered the Hospital to bargain with the Union in good faith and take other remedial actions.  The Hospital filed a timely petition for review of the Board's decision and order, and in turn, the Board sought enforcement of its Order against the Hospital.

## II.  Discussion

### A.  Standard of review

The Board's determination regarding the non-supervisory status of the RNs is entitled to judicial deference "unless those findings fail to derive support from substantial evidence in the record as a whole."  Edward St. Daycare Ctr., Inc. v. NLRB, 189 F.3d 40, 46 (1st Cir. 1999) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) (holding that if the Board's findings are supported by substantial evidence on the record, a reviewing court may not displace the Board's choice between two

fairly conflicting views, even if the court "would justifiably have made a different choice had the matter been before it de novo")); see also 29 U.S.C. § 160(e).

In reviewing the Board's findings and conclusions on the conduct of elections, the Board is entitled to a "wide degree of discretion" in establishing what "safeguards [are] necessary to insure [that the outcome reflects a] fair and free choice of bargaining representatives by employees." NLRB v. A.J. Tower Co., 329 U.S. 324, 330 (1946); accord NLRB v. Reg'l Home Care Servs., Inc., 237 F.3d 62, 66-67 (1st Cir. 2001). The party "claiming taint of an election [that it seeks to] set aside, bears the burden of proof on the issue," id. at 67, and is required to establish that the Board has abused its discretion in concluding otherwise.

## B. **The Supervisory Status of the RNs**

In NLRB v. Kentucky River Community Care, Inc., 532 U.S. 706, 713 (2001), the Supreme Court restated the three-part test for determining the statutory definition of a "supervisor" under Section 2(11) of the Act:

> Employees are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions, (2) their 'exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgement,' and (3) their authority is held 'in the interest of the employer.'

Id. at 713 (quoting 29 U.S.C. § 152(11)). Thus, the duties of the Hospital's RNs must satisfy all three of Kentucky River's prongs

-6-

before the RNs can be considered supervisors within the statutory exclusion of Section 2(11).[4]  In this case, whether or not the Board's determination of the RNs' non-supervisory status is legally a close one, it is supported by substantial evidence on the record, and thus must be sustained.  While we discuss only the principal findings of the Board, suffice it to say that we are satisfied that the Board's other findings all meet the legal standards required by the Act.

The twelve supervisory functions in Section 2(11), referred to in Kentucky River, 532 U.S. at 713, are "to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly direct them, or to adjust their grievances, or effectively recommend such action."  29 U.S.C. § 152(11).  Not all of these functions are at issue in this case, and thus, our discussion will be limited to the functions in dispute.[5]

---

[4]  It is worth noting that in enacting Section 2(11) of the Act, Congress emphasized its intention that only supervisory personnel vested with "genuine management prerogatives" should be considered supervisors, and not "straw bosses, leadmen, set-up men and other minor supervisory employees."  NLRB v. Health Care & Retirement Corp. of Am., 511 U.S. 571, 587-88 (quoting S. Rep. No. 80-105, at 4 (1947), reprinted in 1 N.L.R.B., Legislative History of the Labor Management Relations Act, 1947, 410 (1948)).

[5]  The requirements of 29 U.S.C. § 152(11) are disjunctive, and so any of the enumerated powers may signify supervisory status.  See N.E. Utils. Serv. Corp. v. NLRB, 35 F.3d 621, 624 (1st Cir. 1994). In this case, however, there is apparently no allegation that the RNs "hire," "transfer," "suspend," "layoff," "recall," "promote," "discharge," "reward," or "adjust [the] grievances" of employees.

The statutory term "independent judgment," which is part of the definition of supervisor, is, as the Supreme Court has recognized, "ambiguous with respect to the degree of discretion required for supervisory status." 532 U.S. at 713. "[T]he mere fact that an employee gives other employees instructions from time to time does not . . . render him . . . a supervisor." Edward St. Daycare, 189 F.3d at 48 (quoting Telemundo de P.R. v. NLRB, 113 F.3d 270, 274 (1st Cir. 1997)).

The Hospital argues that the RNs are supervisors in that they assign work to employees, but the record shows that they do so by consensus among those who will be affected by the assignments. We have held that the assignment of work through a cooperative process such as this does not meet the criteria of "independent judgment" required by the Act. Id. at 47, 50.

The Hospital also claims that the RNs have a supervisory role in evaluating and reprimanding employees. However, the Board found that, in this respect, the evidence was limited to general testimony to the effect that staff RNs make oral representations to Area Supervisors concerning the job performance of other employees. Again this evidence is insufficient, as it is well settled that where an employee's involvement in the evaluation process is merely reportorial in nature, it is not sufficient to meet the supervisor classification. Telemundo, 113 F.3d at 275. Filling out forms related to performance issues, without more, does not qualify

-8-

employees for supervisory status. Instead, the Hospital would have to establish that the RNs' recommendations to higher-ups with disciplinary power are routinely taken into account in the exercise of their disciplinary power. Compare NLRB v. Hilliard Dev. Corp., 187 F.3d 133, 147 (1st Cir. 1999) (finding evidence insufficient to show that nurses played a supervisory role where they only reported to others who made the actual disciplinary decisions), with Edward St. Daycare, 189 F.3d at 51-52 (indicating that there must be evidence that recommendations made in evaluations had a real impact on wages, promotions or other terms of employment). There is substantial evidence on the record justifying the Board's conclusion that the Hospital failed to prove that the RNs played this type of significant role in evaluating and reprimanding employees.

On the issue of supervising care, the Board found that any discretion exercised by the staff RNs in directing patient care tasks of licensed practical nurses ("LPNs") and technicians was constrained by physicians' orders and detailed protocols which set forth in detail the diagnostic and treatment standards, in effect, negating the need for any meaningful supervisory discretionary supervision by the RNs. This is precisely what the Supreme Court meant when, in Kentucky River, it indicated that discretion may be reduced below the supervisory threshold by detailed orders and regulations. 532 U.S. at 713-4. In fact, the record further shows

that the RNs have no independent discretion in determining which technician will perform what work.  The RNs simply pass on the order for the work prescribed by the attending physician, and the technician on duty to do that kind of work carries out the appropriate test.  The results are then provided to the physician for appropriate professional evaluation and use.  This scenario is sufficient to support a conclusion that the RNs do not supervise the work of the LPNs or technicians by reason of their assigning work or tasks to them.  This result is bolstered by the lack of any evidence demonstrating that the RNs are or have been held responsible for the work or performance of the technicians or LPNs. The lack of such evidence is significant, because we have held that an important indicator of supervisorship is that in overseeing an employee one becomes responsible for the errors of that employee. Maine Yankee Atomic Power Co. v. NLRB, 624 F.2d 347, 361 (1st Cir. 1980).  This court also notes that if RNs are considered supervisors, then there would be 1.96 supervisors per employee (an unusually top heavy organizational structure), whereas if they are not supervisors, then there would be approximately one supervisor for every eight employees.  Undoubtedly, the Board reached the correct conclusion on this point.  Kentucky River reaffirmed what has been the law for some time: it is "within the Board's discretion to determine, within reason, what scope of discretion qualifies" an individual as having supervisory status.  532 U.S. at

713. That discretion has been exercised by the Board in this case with considerable support in the record.

## C. **The Conduct of the Election**

The essence of the Hospital's claim concerning the conduct of the election is that the Union distributed copies of the official Board sample ballot, defaced with a "Yes" box marked with an "X", without identifying on the ballots the source of the defacement and thereby creating the misleading impression that the Board favored the Union. The record is undisputed that a Union representative reproduced and distributed a facsimile of a sample ballot[6] marked "Yes" at the Hospital's only entry and exit point shortly before the election was held. The Union was not identified in any manner on the facsimile ballot as being the source of the same. The specific issue presented was thus whether this leaflet had the tendency to mislead the eligible employees into believing that the Board favored the Union.

---

[6] More accurately, as is depicted by the exhibit in evidence, what was reproduced was the Board's notice of elections which contains information directed at employees, such as a description of who was eligible to vote, the time and place where they could vote, and a copy of a blank ballot, which in this case was marked with an "x" in the "Yes" box.

The Board concluded that it did not.[7]  The Board considered evidence that for several months prior to the election, Union organizers, clearly identified as such by recognizable logos on their shirts and windbreakers, engaged in handbilling activities at the location where the controversial ballot was later handed out to employees.  Furthermore, that leaflet was reproduced on yellow stock paper in contrast to the blue paper on which the official notice of election was printed.  The questioned leaflet was distributed by the same six to eight Union organizers who had engaged in similar activities, at the same location, during the months prior to the election.  Thus, the Board concluded that the employees were not misled into believing that the altered ballot shown in the Union-reproduced copy of the election notice indicated that the Board favored an election outcome partial to the Union.

This conclusion is strengthened by the disclaimer that was part of the Board's official notice of election:

> WARNING: THIS IS THE ONLY OFFICIAL NOTICE OF
> THIS ELECTION AND MUST NOT BE DEFACED BY
> ANYONE.  ANY MARKINGS THAT YOU MAY SEE ON ANY
> SAMPLE BALLOT OR ANYWHERE ON THIS NOTICE HAVE

---

[7]  To resolve such questions, the Board has developed a two-part test.  First, it inquires whether the "altered ballot. . . on its face clearly identifies the party responsible for its preparation," in which case it is per se unobjectionable. SDC Invs., Inc., 274 N.L.R.B. 556, 557 (1985).  If not, the Board engages in a fact-specific inquiry of "the nature and contents of the material," id., and the "circumstances of distribution." 3-Day Blinds, Inc., 325 N.L.R.B. 1220, 1221 n.7 (1990); see also Kwik Care Ltd. v. NLRB, 82 F.3d 1122, 1128-29 (D.C. Cir. 1996) (describing this two-part test and finding Board's application of it reasonable).

-12-

BEEN MADE BY SOMEONE OTHER THAN THE NATIONAL LABOR RELATIONS BOARD AND HAVE NOT BEEN PUT THERE BY THE NATIONAL LABOR RELATIONS BOARD. THE NATIONAL LABOR RELATIONS BOARD IS AN AGENCY OF THE UNITED STATES GOVERNMENT, AND DOES NOT ENDORSE ANY CHOICE IN THE ELECTION.

The evidence is unrefuted that these notices, with the disclaimer language, on the blue paper and with the unmarked sample ballot, were posted in prominent places throughout the Hospital, including on or near the employees' time clock. Furthermore, these notices were affixed for some time before the election took place. Based on these factors the Board opined that the disclaimers would have sufficiently reassured the employees of the Board's neutrality in the election, thus adequately countering any false impression that might have been caused by the Union's reproduction of the notice with the marked ballot. See Kwik Care Ltd., 82 F.3d at 1128-29; Comcast Cablevision, Inc. 325 N.L.R.B. 833 (1998).

When taken together with the fact that the marked notices were distributed by persons clearly identifiable as being associated with the Union, the likelihood that any employee would be misled into believing that the Board favored the Union in the election is not high. The Board thus concluded that the actions complained of by the Hospital, although proven factually, did not warrant the setting aside of the election.

We cannot say that the Board's decision is unsupported by the evidence or that it constitutes an abuse of discretion. See Reg'l Home Care, 237 F.3d at 66-67 (holding that the Court is

-13-

limited to determining whether the Board acted within its discretion in the conduct of elections).

### III. <u>Conclusion</u>

For the reasons stated in this opinion, we conclude that the Board's order is entitled to enforcement and that the Hospital's petition should be **<u>dismissed</u>**.

Costs are awarded to the Board.